## In re PARAMOUNT-PUBLIX CORPORATION.

District Court, S. D. New York.
Oct. 23, 1935.

824

See, also, 10 F.Supp. 504; 12 F.Supp. 16.

Root, Clark, Buckner & Ballantine, of New York City, for receivers and trustees.

Choate, Hall & Stewart, of Boston, Mass., Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., Pillsbury, Madison & Sutro, of San Francisco, Cal., Sonnenschein, Berkson, Lautmann, Levinson & Morse, of Chicago, Ill., Strauss & Hedges and Kiddle, Margeson & Hornidge, all of New York City, Harry Meyer, of Butte, Mont., Hornidge & Dowd, of New York City, Winston, Strawn & Shaw, of Chicago, Ill., and Johnston, Tory & Johnston, of Toronto, Ont., Canada, for trustees.

Rosenberg, Goldmark & Colin, of New York City, for debtor.

Cook, Nathan & Lehman, of New York City, for debtor and Stockholders' Protective Committee.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for Debenture Bondholders' Committee.

Beekman, Bogue & Clark, of New York City, for Bank Group Committee.

Cravath, de Gersdorff, Swaine & Wood, of New York City, for Kuhn, Loeb & Co.

Szold & Brandwen, of New York City, for Munger Debenture Bondholders' Committee.

Nathan Burkan, of New York City, for Creditors' Committee.

Malcolm Sumner and Edwin L. Garvin, both of New York City, for petitioning creditors.

Milbank, Tweed, Hope & Webb, of New York City, for trustee under indentures.

Stroock & Stroock, of New York City, for Paramount Broadway Corporation Bondholders' Committee.

Weiss, Pels & Grant, of New York City, for Schenk Paramount Broadway Corporation Bondholders' Committee.

Cotton, Franklin, Wright & Gordon, of New York City, for trustee under indenture of Paramount Broadway Bonds and Depositary of Committee.

A. J. Schanfarber, of Chicago, Ill., A. M. Frumberg, of New York City, Edgar J. Schoen, of Chicago, Ill., and Samuel Zirn, of New York City, for plaintiff in case of Robert S. Levy v. Paramount Publix Corporation et al. in the Supreme Court New York county.

Samuel Zirn, of New York City, for holders of debenture bonds.

Adolph Feldblum, of New York City, for petitioning creditors in involuntary bankruptcy proceedings.

Saul E. Rogers, of New York City, for holders of debenture bonds and shares of stock.

Louis Martin Levy, of New York City, for holders of shares of stock.

Bibb, Dederick & Osbourne, of New York City, for holders of debenture bond of debtor.

Archibald Palmer, of New York City, for holders of shares of stock of debtor.

Jacob J. Lesser, of New York City, for a stockholder.

Samuel Spring, of New York City, for creditor.

Louis Boehm, of New York City, for stockholders.

Simpson, Thacher & Bartlett, of New York City (Thomas D. Thacher, of New York City, of counsel), for Paramount Pictures, Inc.

COXE, District Judge.

These are applications by fifty-three petitioners for the allowance of fees and expenses in connection with the equity,

bankruptcy, and reorganization proceedings of Paramount-Publix Corporation, the debtor, which, in one form or another, has been under the jurisdiction of this court for about two and a half years. The aggregate amount of the allowances requested is $3,239,828.15, of which $2,841,031.84 is for services, and $398,796.31 for expenses. There have been prior allowances in the equity and bankruptcy proceedings, amounting to $458,029.99.

The various applications were heard by me in open court on notice to all creditors, stockholders, and persons interested in the proceeding; and I was assisted at the hearings and in the consideration of the different applications by Mr. Joyce, the special master, who has been in charge of the case generally since the commencement of the section 77B proceedings (Bankr. Act, 11 U.S.C.A. § 207).

The debtor was a large company, operating through approximately 500 subsidiary and affiliated corporations, with many outstanding securities distributed widely among the general public. Its business comprised all branches of the motion picture industry, including production, distribution, and exhibition. Through one group of subsidiaries the company produced motion pictures and distributed them in all parts of the world; and through another it exhibited pictures in theaters in many parts of the United States and Canada, and in some places in England and France. At the time of the appointment of the equity receivers the company held interests of varying character in more than 1,100 theaters in which its motion pictures were exhibited.

On January 26, 1933, equity receivers were appointed in this District. This was followed, on March 14, 1933, by the adjudication of the company as a bankrupt on its own petition; and on April 17, 1933, bankruptcy trustees were appointed. The business remained in their hands until June 16, 1934, when the section 77B petitions were approved and the bankruptcy trustees were appointed temporary trustees under section 77B. The appointments were made permanent on July 10, 1934.

The reorganization plan, which included also a plan of reorganization of Paramount Broadway Corporation, was formally proposed on December 3, 1934, and, after prolonged hearings before the court, final confirmation was obtained on April 4, 1935; and on July 1, 1935, the debtor became revested with all of its assets.

During the course of the proceedings there were separate reorganizations of many of the subsidiaries, and this necessarily consumed considerable time and effort on the part of the trustees and their attorneys. There are other subsidiaries still in the process of reorganization, on which a large amount of work has been performed. But by and large the work of liquidation, readjustment, and reorganization has been substantially completed, and the business has now been turned back to the reorganized company, with the properties intact and well integrated, the fixed charges greatly reduced, the finances in sound condition, and the good will unimpaired. This is an achievement for which those who have been in positions of responsibility, both in the administration of the estate and the reorganization of the company, are entitled to substantial recognition.

The court, in the order confirming the plan of reorganization, reserved jurisdiction to fix and direct the payment of administrative expenses and to allow reasonable compensation in this proceeding, in the prior equity and bankruptcy proceedings, and in connection with the plan. This provision of the order is in harmony not only with subsection (c), subdivision 9, of section 77B, 11 U.S.C.A. § 207 (c) (9), but is a substitute for the alternative procedure indicated by subsection (f), subdivision 5, 11 U.S.C.A. § 207 (f) (5).

The general rule in equity is (1) that a trust estate must bear the expenses of its administration, and (2) that where one of many persons having a common interest in a fund, at his own expense, recovers or preserves the fund, he is entitled to be reimbursed from the fund for his actual and necessary expenses, including reasonable attorneys' fees. Trustees of I. I. F. v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; United States v. Equitable Trust Co., 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379; Nolte v. Hudson Nav. Co. (C.C.A.) 47 F.(2d) 166. It is also well settled that action taken adversely to the common interest in an effort to deplete the fund does not give rise to any claim for compensation or reimbursement. Hobbs v. McLean, 117 U.S. 567, 582, 6 S.Ct. 870, 29 L.Ed. 940;

Kimball v. Atlantic States Life Ins. Co. (D.C.) 223 F. 463. The rule has, however, an important limitation in insolvency proceedings where a receiver or trustee has been appointed and is represented by competent counsel. Ordinarily, there is then no room for independent participation in the administration of the estate and any one who, without court authorization, performs administrative services, no matter how meritorious, or incurs expense, must look solely to his own clients for payment. In re New York Investors, 79 F.(2d) 182, opinion of C.C.A.2d Circuit, July 22, 1935. In bankruptcy proceedings under the general Bankruptcy Act, the limitation is even more stringent than in equity. In re Eureka Upholstering Co. (C.C.A.) 48 F.(2d) 95; In re Faour (D.C.) 11 F.Supp. 462, affirmed by C.C.A.2d Circuit, 78 F.(2d) 1015, July 1, 1935. The limitation has general application also to proceedings under section 77B.

Under the practice prior to the reorganization statute, costs, including compensation of committee members and committee charges, were customarily taken care of outside of the court proceedings. This gave rise to grave abuses, and, in an effort to control such costs, courts frequently resorted to the expedient of making confirmation of the plan, or of the judicial sale, contingent upon the approval by the court of all reorganization expenses. Bethlehem Steel Co. v. International C. E. Corp. (C.C.A.) 66 F.(2d) 409. In composition proceedings under the general Bankruptcy Act, committees were, however, denied compensation or reimbursement from the estate as not being authorized by the statute. In re Realty Associates Sec. Corp. (C.C.A.) 69 F.(2d) 41.

All reorganization expenses are now expressly declared to be proper subjects of judicial scrutiny and determination. Indeed, there can now be no judicial confirmation of a corporate reorganization plan unless the reorganization expenses "have been fully disclosed and are reasonable, or are to be subject to the approval of the judge." Section 77B (f) (5), 11 U.S.C.A. § 207 (f) (5).

Section 77B (c), 11 U.S.C.A. § 207 (c), provides as follows:

"Upon approving the petition or answer or at any time thereafter, the judge, in addition to the jurisdiction and powers elsewhere in this section conferred upon him * * * (9) may allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor."

■ This language is sufficiently comprehensive to include in the several categories any one having an interest in the reorganization, provided the services for which an allowance is asked are proper and beneficial, and the expenses are actual and necessary. The term "officers" as used in the subdivision is defined in section 1 (18) of the Bankruptcy Act (11 U.S.C.A. § 1 (18) to include "clerk, marshal, receiver, referee and trustee"; and the words "parties in interest" plainly refer to creditors, stockholders, or other persons having claims against, or interests in, the company or its property, other than those represented by "committees or other representatives of creditors or stockholders." There is nothing in the subdivision which makes formal intervention a prerequisite to the granting of an allowance; for not all of the persons mentioned in the subdivision have sufficient standing even to apply for intervention; and subsection (c) (11) was not intended to qualify persons for applications for allowances.

■ There is no warrant under the statute for the granting of allowances for unnecessary services or expenses. Committees are essential in cases where vast numbers of bondholders and stockholders are involved, but a multiplicity of committees representing the same general class of security holders only leads to confusion and waste, and should not be encouraged. Ordinarily, one fairly representative committee for a particular class is sufficient; and before additional committees for the same class can be justified, there should be strong and compelling reasons for their creation and existence. In the present case, an independent committee was formed for the debenture holders of the company, and another for the certificate holders of its subsidiary, Paramount Broadway Corporation. Both of these committees are ask-

ing allowances in the present proceeding. The respective main committees for those classes were selected at the instance of interests which had previously been closely identified with the company; and I think that security holders of those classes were reasonably entitled to independent representation, if, for any reason, they considered that their rights would not be adequately protected by committees chosen in the manner indicated. I am satisfied, therefore, that there was room in this case for these two independent committees; and, although their activities inevitably resulted in some duplication of effort and expense, I believe they made a real contribution to the reorganization and that they are entitled to allowances.

■ The statute permits the payment of reasonable compensation to committee members "for services rendered." This necessarily implies loyal and disinterested service in the interest of the persons for whom the committee assumes to act; and a committee member who, during his period of service, purchases and sells, or purchases, for personal gain, securities of the company which he is engaged in trying to reorganize, is not entitled to an allowance for his services as a committee member.

■ Allowances for reorganization services and expenses are not limited to the period of the section 77B proceedings. This is clear from the language of subdivision (c) (9), which provides that allowances may be made for services and expenses "in connection with the proceeding and the plan." The words "proceeding" and "plan," as used in the subdivision, are not coterminous, and services and expenses in connection with the plan may well extend over a considerable period prior to the institution of the proceeding. The statute, itself, recognizes that the plan may precede the proceeding; and subdivision (e) (1), 11 U.S.C.A. § 207 (e) (1), specifically authorizes the use of acceptances obtained before the filing of the petition. It was held also in Campbell v. Alleghany Corp. (C.C.A.) 75 F.(2d) 947, that such acceptances might be used even though they were obtained prior to the enactment of section 77B. The recent decision of the Circuit Court of Appeals for this Circuit, in Re Allied Owners Corporation (C.C.A.) 79 F.(2d) 187, contains nothing to the contrary. That case concerned only

allowances for services in a previous bankruptcy proceeding, and it was merely held that the provisions of section 48a of the general Bankruptcy Act (11 U.S.C.A. § 76) were applicable. The allowances had nothing to do with reorganization services under section 77B, and subdivision (c) (9) was in no way involved.

■ Any creditor or stockholder is entitled as of right to be heard on the question of the permanent appointment of any trustee or trustees, and on the proposed confirmation of any' reorganization plan (section 77B (c) (11). But mere participation in the hearings at which these questions are discussed, or offering advice, suggestions, or criticisms regarding the proposed plan, or on matters of procedure, does not give rise to any claim for compensation from the estate. These are services for which attorneys should look to their own clients for payment. Nor can any compensation be awarded to attorneys for opposing petitions for allowances, as it is the duty of the court to protect the estate in that respect. Attorney General v. North American Life Ins. Co., 91 N.Y. 57, 43 Am.Rep. 648.

■ There are no satisfactory rules or standards which can be applied safely in fixing allowances for services in judicial proceedings, and the principles laid down by the courts with respect to attorneys' compensation generally have only a very limited application. Receivers, trustees, and their attorneys are court officials, acting under court designation, and there is no opportunity for what Chief Justice Taft called "vicarious generosity" in determining what amounts may properly be paid to them. In re Gilbert, 276 U.S. 294, 48 S.Ct. 309, 72 L.Ed. 580. They can neither expect nor be paid more than "moderate compensation." In re New York Investors, supra. This is equally true with respect to committees, depositaries, and others who perform services in connection with the reorganization. They are part of the court's machinery, and should receive no different treatment than that accorded to receivers, trustees, and their attorneys. The discretion of the judge in fixing such allowances is judicial, and should be exercised sparingly.

In the discussion which follows, I have undertaken to analyze the different petitions in the order in which they have been presented, and to determine what,

if anything, should be allowed on each application.

Nos. 1–4. Charles D. Hilles and Adolph Zukor served as equity receivers from January 26, 1933, until April 17, 1933, when the bankruptcy trustees were appointed. Mr. Hilles and Eugene W. Leake were appointed trustees in bankruptcy; a third trustee was also named, but he resigned and was succeeded on May 19, 1933, by Charles E. Richardson. Messrs. Hilles, Leake, and Richardson became temporary trustees in this proceeding on June 16, 1934, and were made permanent trustees on July 10, 1934; and with the exception of Mr. Richardson, who resigned December 29, 1934, the trustees functioned until the consummation of the plan. They bore a large responsibility during particularly trying times in the operation of a vast enterprise, and performed a difficult and important task with thoroughness and signal ability. Messrs. Hilles, Leake, and Richardson were allowed statutory commissions of $32,433.33 each, in full for their services in the bankruptcy proceedings. Mr. Hilles had previously received an ad interim allowance of $20,000 as equity receiver; and I consider that sum adequate for the short period of the equity receivership. I shall, therefore, allow Messrs. Hilles and Leake, who served as trustees throughout the reorganization proceeding, the sum of $60,000 each; and Mr. Richardson, who resigned as trustee on December 29, 1934, $35,000. Mr. Zukor was president of the debtor at the time of his appointment as receiver. His application for compensation as one of the equity receivers was deferred without prejudice, when the order fixing the ad interim allowances in the equity proceeding was signed, and is now renewed. He is a defendant in one or more suits by the trustees which are pending, but, notwithstanding that fact, he is entitled to some compensation for his services as receiver. During the period of his service, he received salaries from subsidiaries amounting to $4,502.52. He will be allowed $7,500.

No. 5. Messrs. Root, Clark, Buckner & Ballantine, the attorneys for the receivers and trustees, have acted throughout the three proceedings. The magnitude of the enterprise, the multiplicity of the subsidiaries, and the problems presented, indicate the character of the legal services to which a number of partners, and a larger group of associate attorneys, gave practically their entire time and energy. A large number of reorganizations or adjustments relating to subsidiaries have been concluded, or are nearing completion. The aggregate of claims filed has been substantially reduced by litigation or adjustment. Important suits have been instituted; one against the creditor banks was settled as part of the reorganization; and others against officers and directors are being continued by the trustees. A myriad of administrative and legal problems required constant attention and skill. The attorneys state in their petition that during the course of the three proceedings a total of 9,545 hours was spent by partners, and 62,568 hours by associates; and these are factors to be considered in determining the amount of the allowance. In the concerted effort of a large group of lawyers, it can hardly be expected that duplication will be entirely avoided; and it may well be that some unnecessary work was performed; but if that was so, it was the result of extreme care and thoroughness in handling the many complicated and troublesome problems presented. It is to be borne in mind also that during the whole period of the proceedings the legal department of the debtor and its subsidiaries was maintained, and functioned in the performance of routine legal work under the supervision of the trustees' attorneys. As attorneys for the equity receivers, Messrs. Root, Clark, Buckner & Ballantine received an ad interim allowance of $75,000, and they were paid $175,000 on account of their services in the bankruptcy proceedings. The three proceedings may properly be treated as one continuous employment for the present purpose. I shall, therefore, allow them the further sum of $200,000 for services in all the proceedings, together with disbursements of $7,679.08.

Nos. 6–15. In several instances the trustees were authorized to retain special attorneys, principally for work in other jurisdictions. The most important services were those of Messrs. Choate, Hall & Stewart of Boston, extending from March 5, 1934, throughout the reorganization, and relating to the subsidiary, Olympia Theatres, Inc., in receivership in Massachusetts. This company and its affiliates controlled or operated an important chain of theaters in New England. The major

portion of the task has been concluded. I shall, therefore, allow Messrs. Choate, Hall & Stewart $25,000 for services, together with disbursements of $881.93. The following sums are also allowed to the other attorneys in this group: Messrs. Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, for services relating to the Minnesota Amusement Company, operating 70 or more theaters in four states, $3,500 for services, with disbursements of $59.31; Messrs. Pillsbury, Madison & Sutro, of San Francisco, for additional services concerning two subsidiaries and related matters, $2,500, and disbursements of $9.83; Messrs. Sonnenschein, Berkson, Lautmann, Levinson & Morse, of Chicago, for additional services in connection with the suits against Marks Bros. and the Continental Bank, $4,000, and disbursements of $80.16, the item of $205 sought for their obligation to Leo Spitz, an attorney, being disallowed; Messrs. Strauss & Hedges, $501.08; Messrs. Kiddle, Margeson & Hornidge, for services in patent litigation, $700, and disbursements of $14; Harry Meyer, of Butte, Mont., $150, and disbursements of $31.50; Messrs. Hornidge & Dowd, for services in patent litigation, $1,980, and disbursements of $26.81; Messrs. Winston, Strawn & Shaw, of Chicago, $1,500, and disbursements of $16.23; and Messrs. Johnston, Tory & Johnston, of Toronto, $750, and disbursements of $6.75.

Nos. 16, 17. Price, Waterhouse & Co., accountants for the trustees, received $10,-450 for accounting services in the equity and bankruptcy proceedings. For their services in the reorganization proceedings to June 29, 1935, including disbursements, they are allowed $7,500. The application of George W. Myer, Jr., for $1,200, as compensation for work as special accountant is moderate, and that amount is allowed.

No. 18. Joseph P. Day and Peter Grimm, real estate brokers and agents, were employed by the trustees to aid in connection with some burdensome realty owned by the Seneca Holding Company, a subsidiary, comprising the New York and Criterion theaters and adjacent property in New York, and authorized to conduct negotiations looking to a possible sale, lease, or other disposition of the property. They obtained a delay of foreclosure and a reduction in interest, for which they may be compensated. In the main, their reward was contingent upon a sale or lease of the property, which was never effected, and the property was ultimately abandoned. I shall, therefore, allow Messrs. Day & Grimm, jointly, the sum of $2,000 for their services, which I consider adequate under the circumstances.

No. 19. Messrs. Rosenberg, Goldmark & Colin, former attorneys for the debtor, have received, in addition to a $5,000 retainer, $10,000 on account for services in the equity and part of the bankruptcy proceedings, and $3,500 in full for the remaining portion of the latter period. While mindful of their services in defending the receivership and resisting the attacks on the voluntary bankruptcy petition, the aggregate of the sums received by them is believed to be adequate for all their work in the earlier proceedings. They are allowed $2,500 for their services following the filing of the section 77B petition, with disbursements of $209.75.

No. 20. Messrs. Cook, Nathan & Lehman acted as attorneys for the stockholders' committee throughout the proceedings, and were retained in November, 1934, as attorneys and counsel for the debtor in the reorganization proceedings. They have been responsible in large measure for the fact that the stockholders' rights have been preserved. As attorneys for the debtor in the reorganization proceedings, they had the principal responsibility for the successful carrying through of the plan; they conducted the prolonged hearings before the court while the plan was under consideration; they bore the brunt of most of the negotiations which enabled the plan to be offered for confirmation; and they drafted all of the papers and documents in the court proceedings and in the effectuation of the plan. These services required unusual skill and consumed a considerable amount of time. I shall, therefore, allow Messrs. Cook, Nathan & Lehman, as attorneys for the debtor in the section 77B proceedings, $75,000, and as attorneys for the stockholders' committee, $40,000, a total of $115,000 for services, together with disbursements of $3,019.18.

No. 21. A committee of stockholders was organized January 27, 1933, and 2,154,000 shares of stock were ultimately deposited under the deposit agreement. Compensation is sought by Barney

Balaban, Maurice Newton, and Gerald Brooks, three of the five members of the committee, and by Richard W. Matthews, secretary of the committee. Mr. Balaban is the president of Balaban & Katz Corporation, 96½ per cent. of the common stock of which is owned by the debtor, and I do not think that one in that position should expect or receive compensation for acting as a member of the committee. While serving on the committee, Mr. Newton purchased and sold debentures, and Hallgarten & Co., of which he is a general partner, bought and sold debentures and stock. Mr. Brooks, prior to joining the committee on June 4, 1934, had traded heavily in the securities of the company; thereafter, he purchased $9,000 of debentures, which he still owns, at a substantial advance above his purchase price. There was nothing objectionable in his purchasing and selling securities of the company before he became a member of the committee, but once he joined the committee, it was his clear duty to the persons he was assuming to represent to refrain from trading in, or purchasing, the securities of the company he was helping to reorganize; and I consider him disqualified from receiving any compensation from the general estate. I make the same ruling with respect to the application of Mr. Newton. In consequence, no allowance is granted to any of the members of the stockholders' committee for services. Richard W. Matthews, who has acted as secretary of the committee since January 27, 1933, is awarded $3,000 for his compensation.

This committee borrowed $60,000 from a banking institution, and disbursed $57,769.31; they incurred other obligations, which they ask to have allowed as expenses. Item (a) represents the committee's actual disbursements of $57,769.31, and consists largely of payments for necessary printing, advertising, postage, stock exchange listings, and a disbursement of $17,860.92 to Messrs. Coverdale & Colpitts, consulting engineers and accountants, for "out of pocket expenses." The sum of $1,527.92 paid to Messrs. Cook, Nathan & Lehman for typewriting is eliminated, and item (a) is accordingly allowed at $56,241.39.

The following unpaid obligations of the stockholders' committee are also allowed: (b) Commercial National Bank & Trust Company, $150.36; (c) Commercial National Bank & Trust Company, for interest on loan of $60,000 to date of payment, to be computed; (d) American Bank Note Company, $362.40; (e) Messrs. Cook, Nathan & Lehman, $221.78; (h) Bank of America National Trust & Savings Association, Los Angeles, subdepositary, $227.45; (j) Whitney National Bank of New Orleans, a subdepositary, $125.

The charge of First National Bank of Chicago (i), a subdepositary, for $2,978.60, includes an item of $2,238.35 for acceptance of 2,632 stock certificates, which is reduced to 50 cents a certificate; and the total charges of the bank are allowed in the sum of $2,056.25. Mr. Balaban (k), a resident of Chicago, billed to the committee his travel, hotel, and incidental expenses in attending committee meetings, amounting in an aggregate to $2,640.36; he attended 14 meetings of the committee in New York, and should be reimbursed only for his reasonable and necessary expenses, including a moderate allowance for subsistence. I think the present bill is excessive, and it is allowed only at $1,750.

Item (f) is a claim of Coverdale & Colpitts in the sum of $33,116.14, in addition to the $17,860.92 already paid to them by the committee. This includes charges of Mr. Coverdale for all or part of 113 days, at the rate of $250 a full day; Mr. Burpee for part or all of 34 days, at $150 a full day; and Mr. Burgess for all or part of 48 days at the same figure. The fact that a higher rate of compensation was paid to one of these gentlemen by the government in another case is no criterion of what may properly be allowed in this proceeding. Their charge also includes an item of $7,066.14 for "office overhead to cover general expenses, rent, insurance," etc., which is measured by 80 per cent. of their pay roll. This pyramiding of charges in a proceeding of this kind is simply indefensible. I also think the per diem charges of the various partners are excessive. They will be allowed $10,000, in addition to what they have already received, making a total of $27,860.92 for all services.

Item (g) is an unpaid bill of the Commercial National Bank & Trust Company for its charges as depositary for the committee, amounting to $73,284.-

16. While the need of a depositary to receive deposits, issue certificates, maintain safe custody, and perform the incidental work in handling securities is recognized, and the charges made are said to be standard, the court will not be bound by any fixed scale employed by banks generally for similar services. The charges as presented include $18,126.88 for receiving for deposit 2,125,377 shares of stock represented by 50,180 certificates from 18,155 depositors; $34,472 for issuing 68,944 certificates of deposit at 50 cents each; $16,614.50 for maintenance of certificates of deposit accounts; and $2,732.07 for custody. All of these items seem excessive. The first is at the rate of 1 cent a share up to a certain number of shares, and, thereafter, at ¾ and ½ cent a share. Regardless of what may be the accepted scale, I think that a charge for merely receiving stock certificates should be more related to the number of certificates than the number of shares represented. The charge made amounts to about $1 for each depositor, and about 35 cents for each certificate. When the volume is large, I believe that 10 cents for each stock certificate is ample; and the charge is accordingly reduced to $5,018. Up to a certain point a charge of 50 cents for issuing each certificate of deposit and transfer is not unreasonable, but I think that where the number runs into large figures there should be a scaling down after a specified limit has been reached. For the first 25,-000, a charge of 50 cents each will be allowed, and 25 cents for the remaining 43,944, making a total of $23,486. The maintenance item of $16,614.50 is a yearly charge of 50 cents for maintaining each certificate of deposit account. I think that a yearly charge of 25 cents for each account is sufficient, and the item is accordingly reduced to $8,307.25. The custody charge is calculated on a percentage of the value of the deposited securities. This is excessive, if for no other reason than that the values used are entirely out of line with the real value of the security. I think a flat charge of $1,500 for custody during the entire period of the service is adequate. The item of $251 for "cost of supper money account overtime" is disallowed. The other items will not be disturbed. The total charges of the trust company are accordingly reduced to $39,398.96.

No. 22. The Vanderlip committee, representing holders of debentures of the debtor, was organized in January, 1933; it has six members; and no compensation is asked by Duncan G. Harris, one member, and none as a committee member by Dr. Julius Klein, who was employed by the committee on a full time basis at a monthly salary, plus his expenses, these being advanced from time to time by Kuhn, Loeb & Co., at the request of the committee. This committee ultimately represented $14,813,000 face amount of debentures, and held 38 meetings; and none of the committee members purchased or sold or otherwise traded in securities of the debtor for his own account, except Messrs. Vanderlip and Stern. Mr. Vanderlip bought in 1934 an aggregate of $175,000 debentures, and sold $99,000 at a substantial profit. He retained the remainder at market levels substantially above the amounts paid. Mr. Stern purchased and sold $30,000 of debentures in 1933 and 1934, and purchased and sold stock certificates of deposit to the extent of 5,700 shares. Lawrence Stern & Co., of which he is a member, purchased and sold in 1934 $25,000 of debentures, on which a profit was realized. The reasons already expressed on this subject require denial of Mr. Vanderlip's request for $50,000 and Mr. Stern's for $7,500. The sum of $2,500 each is allowed to Messrs. Robert R. Cassatt, Morris M. Ernst, and Duncan G. Harris, the remaining members of the committee.

The Vanderlip committee requests: (1) Reimbursement of $42,077.50 expended for advertising, printing, accounting services, and depositary charges of $18,692.92 by the Chase National Bank; (2) $48,785.96 for unpaid obligations consisting of charges by the same depositary amounting to $37,716.95, and bills for printing, advertising, and interest on advances by Kuhn, Loeb & Co.; and (3) $52,390.15 as the salary and expenses of Dr. Julius Klein who was employed from July 28, 1933, to April 18, 1935, at $2,000 a month until January 12, 1935, and thereafter at $500 a month, plus his expenses, including the rental of an office in the Paramount building, and the salaries of assistants.

It is stated that the rates charged by the Chase bank are no more and in some instances less than the scale fixed

by the Corporate Fiduciaries Association. The bills paid by the Vanderlip committee include items of (a) $8,439 for receiving for deposit or exchange 8,265 debentures at 50 cents each, and issuing 8,613 certificates of deposit at the same rate; (b) $3,164 for receiving and filing with the referee 1,582 proofs of claim; (c) $3,603.64 for general supervision which is calculated at 25 per cent. of the other items in the bills; and (d) overtime items of $273. There is no warrant for any of the last three charges, and they will be disallowed. The charge for receiving debentures should be no greater than 10 cents each, the amount allowed to the depositary for the stockholders' committee. Accordingly, the paid bills of the bank are disapproved to the extent of $10,346.64, and the paid disbursements of the committee are reduced correspondingly and allowed at $31,730.86.

The unpaid bills of the same bank include charges of (a) $15,674.50 for receiving for deposit or exchange 8,388 debentures and issuing 22,961 certificates of deposit, likewise at 50 cents each; (b) $4,810 for receiving and filing with the referee 2,405 proofs of claim; (c) $3,734.87 representing a percentage charge for general supervision; and (d) $213 for overtime. The last three items are disallowed for reasons previously stated. Allowing 10 cents for each debenture received and 50 cents for each certificate issued up to 25,000 and 25 cents thereafter, and giving effect to the number specified in the paid bills, the unpaid charges of the bank are disapproved to the extent of $13,756.57. Among the unpaid obligations of the committee is a bill of $1,942.80 from Lawrence Stern for traveling and incidental expenses. He is apparently a resident of Chicago, and is entitled only to be reimbursed for his necessary and reasonable expenses while engaged in the work of the committee. The bill seems excessive and is allowed only to the extent of $1,750. Giving effect to these reductions, the unpaid bills of the committee are reduced to $34,836.59 and allowed at that sum.

This committee also requests the allowance of the sum of $52,390.15 to cover the amount paid by Kuhn, Loeb & Co. for the account of the committee to Dr. Klein as salary and expenses. The amount includes $2,068.05 paid to the Savoy Plaza Hotel, presumably for living expenses, and $335 for incidental disbursements, for which there is no warrant whatever. The remainder amounting to $49,987.10 will be allowed to the committee.

No. 23. Messrs. Davis, Polk, Wardwell, Gardiner & Reed have been attorneys for the Vanderlip committee during the entire course of the proceedings, and have had a very large part to play in the reorganization of the company. They have devoted a vast amount of time to the case, and have participated in all of the negotiations leading up to the promulgation of the plan, and in all of the court proceedings. The committee which they represented held $14,813,000 face amount of debentures, and their efforts contributed largely to the successful reorganization of the company. They are allowed $75,000 in full for their services.

No. 24. Twelve creditor banks with claims approximating $14,000,000 were represented by a committee of three. The chairman and secretary, both officers of one of the principal banks, request compensation of $30,000 and $20,000, respectively, in addition to the committee's disbursements, which include $18,500 paid to the attorneys for the committee, Messrs. Beekman, Bogue & Clark. The banks were defendants in a suit brought by the trustees, in which certain transfers to the banks were challenged as preferential, and a large part of the work of the committee was performed in preparing for the defense of this suit; at least to that extent the committee's efforts were adverse to the debtor, and no allowance is justified. I can see no good reason, either, for compensating two of the higher officers of one of the largest bank creditors because they acted for a small committee in which the other banks participated; their services were only such as were required to protect the interests of their own bank; and they should look to it for their compensation. The bank committee has, however, incurred disbursements, which will be allowed to the extent of $20,559.91. This amount includes $18,500 paid to the attorneys for the committee and deducted from their allowance. I have disallowed the item for typewriting which appears to be nothing more than general typing of papers and reports to the banks; also railroad fares and other items apparently related to the litigation against the banks.

No. 25. Messrs. Beekman, Bogue & Clark, attorneys for the bank committee, were engaged largely in the defense of the bank suit, which was settled as a result of the reorganization; and they should look to their clients for compensation for the services they performed of that nature. They, may, however, be compensated for their services in connection with the reorganization proceedings. These services were important, and contributed largely to the result; and I shall, therefore, allow them $35,000, from which the sum of $18,500 already paid by the committee should be deducted.

██ Nos. 26, 27. I do not think any allowance may properly be made to Kuhn, Loeb & Co., or their attorneys, Messrs. Cravath, de Gersdorff, Swaine & Wood, for services. When the Paramount Company first went into the hands of receivers, Kuhn, Loeb & Co. immediately brought about the organization of the principal committees preparatory to an early reorganization. They had been the sponsors for most of the company's securities, and it was both natural and proper that they should wish to see a satisfactory reorganization effected. To that end, they commenced factual studies and surveys of the company's condition, and, with their attorneys, participated actively in the preparation and negotiation of a proposed plan of reorganization. In the early stages of these negotiations, Kuhn, Loeb & Co. were in effect reorganization managers, and, if the situation had remained as it then was, they undoubtedly would have appeared in that capacity in the reorganization proceedings, and have qualified for an allowance under the terms of the statute. This, however, was not to be, and when suits were contemplated by the trustees against former directors of the company and members of their own firm, they concluded that for the best interests of the company and the good of the entire reorganization, they should withdraw from active participation in the proceedings. It was then that Messrs. Cook, Nathan & Lehman were brought into the case, and presented the plan, as attorneys for and on behalf of the debtor. It was conceded on the hearing that Kuhn, Loeb & Co. could not qualify under the statute as reorganization managers, but it was sought to support the application for allowances on the ground that they were employees of the principal committees; two of these committees even made belated requests that Kuhn, Loeb & Co. be recognized in that capacity. The difficulty, however, with this contention is that they were in no sense performing work which the committees were in any position to delegate, and neither they nor their attorneys are entitled to be paid from the general estate.

Nos. 28, 29. Lloyd A. Munger, Harry Mottsman, and James B. Murray acted as an independent committee for the debentures. This committee was formed shortly after the receivership, and represented approximately 750 debenture holders having claims in excess of $1,850,000; it functioned throughout the proceedings, and contributed to some extent in the reorganization. I think there was room in this case for an independent committee, even though some duplication of effort was necessarily involved. The Munger committee is, therefore, allowed $3,000 as compensation, with disbursements of $1,800.72; and Messrs. Szold & Brandwein, attorneys for the committee, are allowed $20,000 for their services, with disbursements of $78.59.

Nos. 30, 31. The merchandise creditor's committee have withdrawn their application for compensation, but request reimbursement for their expenses amounting to $1,197.40. The schedule of these expenses contains a number of items which are either unsupported by vouchers or are clearly improper, namely: $217.10 paid to notaries employed on a per diem basis to solicit proofs of claim and powers of attorney; $75.32 for traveling and local telephones; and items for legal magazines, books, and overtime suppers. I shall, therefore, allow only $784.88 for expenses. Mr. Nathan Burkan, attorney for the committee, is awarded $15,000 for his services.

██ No. 32. Messrs. Malcolm Sumner and Edwin L. Garvin, representing three holders of debentures, amounting to $15,-000, filed a petition under section 77B. There were already two strong committees representing hundreds of debenture holders then in the field; and these two committees were fully capable of looking after the interests of all debenture holders. The Sumner and Garvin petition was filed the same day that the Vanderlip committee filed a similar petition; and both were refiled on the day

following. Clearly, there was no justification whatever for this duplication of effort; the Vanderlip petition was entirely adequate for the purpose of instituting the proceeding, and the other was not only unnecessary but tended to complicate and confuse a perfectly plain and straightforward situation. From then on, Messrs. Sumner and Garvin participated in all of the reorganization proceedings, but they contributed little, if anything, to the work of reorganization; they were in no different position than the other attorneys representing individual creditors and security holders who were heard on the fairness of the plan; and they are not entitled to any allowance from the general estate either for services or disbursements.

Nos. 33, 34. Messrs. Sumner and Garvin employed Orrin R. Judd and J. Andrew Crafts as accountants to assist them in the case, and these gentlemen are requesting an allowance of $12,500 for services. Myron Robinson was similarly employed as an expert, and he asks an allowance of $11,000 for services. There was no authority to incur such obligations as these, and make them a charge against the general estate; the work was wholly unnecessary; and the claimants have no standing to ask for allowances. Both applications are denied.

Nos. 35, 36. The Chase National Bank was trustee under the two indentures of the debtor, and continued during the proceedings to perform services as trustee and as registrar of indentures. It requests compensation of $1,975.22 for all its services after June 16, 1934, which is granted. The sum of $1,000 is allowed to Messrs. Milbank, Tweed, Hope & Webb, attorneys for the Chase bank, for their services.

No. 37. The Paramount Broadway Corporation, a subsidiary of the debtor, was reorganized in conjunction with the latter. That company owned the Paramount building at Broadway and 43d street, which housed the main Paramount theater in New York City and the principal offices of the debtor; the building also had available for leasing to outsiders a large amount of commercial and office space. There was a mortgage on the property, under which certificates amounting in the aggregate to $8,875,000 were outstanding, and two committees were organized to look after the inter-

ests of the certificate holders. These committees, after prolonged negotiations with the debtor's trustees, agreed upon a plan of reorganization, which later was incorporated in and became a part of the plan of reorganization of the debtor.

The committee headed by Peter Grimm was the larger and more important of the two committees, and the petition states that 42 meetings of the committee were held. I shall allow $1,500 each to Messrs. Grimm, Smith, Forgan, and McAneny. Mr. Dowling did not become a member of the committee until January, 1934, or a year after the committee was formed, and his compensation is fixed at $1,000. Mr. Goelet purchased certificates of the company while he was a member of the committee, and, for the reasons already stated, will be denied compensation.

The Grimm committee also asks that its expenses amounting to $15,714.39 be allowed. These expenses include (a) $6,807.50 for printing and advertising; (b) $4,975 paid to Lloyd W. Georgeson for services in procuring assents; and (c) $2,892.41 paid to Messrs. Stroock & Stroock, attorneys for the committee, for their disbursements. The item of $6,807.50 (a) is supported by vouchers, and is allowed at that figure. With respect to the payment to Georgeson, it appears that he was employed on March 19, 1935, under a written contract at specified rates to procure assents to the plan, which were required by April 3, 1935; and although the amount seems large for the services rendered, I do not think the payment was unwarranted. The item of $2,892.41 (c), stated to have been paid to Messrs. Stroock & Stroock for their disbursements, is allowed at $2,512.41, the charge of $380 for "typing" being disallowed. The total obligations of the committee are allowed as $15,334.39.

No. 38. Messrs. Stroock & Stroock were the attorneys for the Grimm committee during the entire course of the proceedings; they participated in all of the negotiations and court proceedings in connection with the reorganization; and they were for a period of over two years in constant touch with the operation and management of the building. These services were important, and consumed a considerable amount of time; and I am accordingly allowing $40,000, inclusive of the services of Mr. Deitch as secretary of the committee.

Nos. 39, 40. The Schenk committee represented about 200 of the Paramount-Broadway certificate holders, with claims aggregating about $550,000. This committee is in much the same position as the Munger committee acting for debenture holders of the debtor, and I think an independent committee for such certificate holders was justified. The committee will be allowed a total of $2,000 as compensation, and disbursements of $297.-14; and the attorneys for the committee, Messrs. Weiss, Pels & Grant, are allowed $7,500 for services, together with disbursements of $84.33.

Nos. 41, 42. The Chemical Bank & Trust Company, as trustee under the Paramount Broadway indenture, asks $6,-100 for ordinary services, including registration of certificates, and for extraordinary services occasioned by these proceedings. A further sum of $15,324 is sought for depositary charges. The indenture provided that the trustee should be entitled to reasonable compensation and reimbursement for expenditures, including the employment of agents and attorneys. For its services as trustee, the bank is allowed $1,250. Several of the charges for depositary services are subject to the views already expressed. The item of $2,655.90 for receiving bonds is accordingly reduced to $557.40; the custody item of $2,038, based on a charge for each year at a percentage of value, is reduced to $1,000; and the general supervision charge of $3,064, which represents 25 per cent. of all other charges, is disallowed entirely. The remaining items are allowed, making a total of $10,372.-70 for all services, with disbursements of $307.15. Messrs. Cotton, Franklin, Wright & Gordon, attorneys for the bank, are allowed $3,500, which is to be inclusive of disbursements.

No. 43. The New York Trust Company was appointed agent of the special master to receive assents to the plan and old securities for exchange; and its work is not yet completed. It is allowed $3,-297.50 for its services to July 1, 1935, together with disbursements of $415.20.

No. 44. A. J. Schanfarber, A. M. Frumberg, Edgar J. Schoen, and Samuel Zirn request an allowance for services and disbursements in the prosecution of a suit by one Levy in the state court. This suit was representative in its nature, and was brought in December, 1932, against the debtor and others; and it is now asserted broadly that by reason of the litigation, important assets were conserved for the benefit of the debtor. The suit was ultimately dismissed, and under no possible theory are the attorneys entitled to recognition in the present proceeding.

No. 45. Samuel Zirn acted as attorney for several debenture holders in the three proceedings, and asks a separate allowance for his services and disbursements. He challenged the equity receivership and urged administration in bankruptcy, opposed the voluntary petition, intervened on an application for a writ of prohibition, challenged the qualifications and election of the bankruptcy trustees, conducted extensive 21A examinations, opposed applications for allowances, and participated in the court proceedings. He was entirely unsuccessful in most of his contentions, and is entitled to no allowance from the general estate. He did not recover any property, accomplished nothing by his attacks upon the jurisdiction and against the trustees, and should look to his own clients for his compensation for services and disbursements in connection with the various court proceedings.

Nos. 46, 49. Adolph Feldblum, as substituted attorney for the petitioning creditors, and Messrs. Bibb, Dederick & Osbourne, attorneys for an intervener in the involuntary bankruptcy proceeding, are obviously in no position to look to the general estate for compensation.

Nos. 47, 48; 50–53. The several applications of Saul E. Rogers, Louis M. Levy, Archibald Palmer, Jacob J. Lesser, Samuel Spring, and Louis Boehm are disallowed. These attorneys represented various creditors and stockholders, and Mr. Palmer also appeared for security holders of Allied Owners Corporation, a creditor of the debtor. The services consisted largely in attendance at the court proceedings, participation in the examination of witnesses, and arguments during the consideration of the plan of reorganization. These services, although helpful to the court in the determination of the different issues presented, are not of such a character as to entitle any of the applicants to an allowance from the general estate.