In re PHILADELPHIA & W. RY. CO.
No. 18014.

District Court, E. D. Pennsylvania.
June 10, 1947.

170

Drinker, Biddle & Reath, by Thomas Reath, all of Philadelphia, Pa., and Hannum, Hunter, Hannum & Hodge, of Chester, Pa., for debtor.

Thomas Stokes, of Pepper, Bodine & Stokes, all of Philadelphia, Pa., for Fidelity-Philadelphia Trust and for group of banks holding bonds of debtor.

Charles Myers, of Barnes, Dechert, Price & Smith, all of Philadelphia, Pa., for Girard Trust Co.

David F. Maxwell, of Edmonds, Obermayer & Rebmann, all of Philadelphia, Pa., for one of bondholders' committees.

James M. Brittain, of Philadelphia, Pa., and Frank M. Hunter, of Media, Pa., for Philadelphia Suburban Transp. Co.

Jacob I. Weinstein and A. Jere Creskoff, both of Philadelphia, Pa., for bondholders.

Reuben Singer and Norman J. Griffin, both of Philadelphia, Pa., for objecting preferred stockholders.

Frederick T. Finnigan, of New York City, for Securities and Exchange Commission.

**KIRKPATRICK, District Judge.**

The petitions for allowances now before the Court are the final phase of the Debtor's reorganization, which began with the filing of a petition under section 77B, Bankr.Act, 11 U.S.C.A. § 207, in 1934 and terminated 12 years later, in 1946, with the consummation of a satisfactory plan and the transfer of the property to a new company. From the beginning it was recognized that the Debtor was insolvent and a formal finding to that effect was made in March, 1943. The Debtor remained in possession and throughout the period of reorganization its business was operated efficiently and with profit by its directors and officers in collaboration with representatives of the bondholders.

Three successive plans of reorganization filed by the Debtor have been before the Court. The first plan, presented in July, 1935, was approved and confirmed in 1937, but it was never consummated because it became evident very shortly after its confirmation that a decline in the company's business made it unworkable. The second plan was presented in May, 1939, but was disapproved in July, 1941 by the Pennsylvania Public Utilities Commission, after which it also was abandoned. The third plan was presented in March, 1942. Just before its confirmation, in January, 1944, a fourth plan was presented by a group representing about 40 per cent of the bonds. This has been referred to throughout the proceedings as the P.S.T. (Philadelphia Suburban Transportation Co.) plan. Thereafter, the third plan was amended by incorporating some of the provisions of the P.S.T. plan and, as so amended, was finally consummated and is now in operation.

### Drinker, Biddle & Reath.

■ The claimants request $75,000. They represented the Debtor for 12 years. The fee is not objected to, is reasonable and will be allowed, together with disbursements claimed. Five thousand dollars has been paid and the present allowance is $70,000 plus disbursements.

### Hannum, Hunter, Hannum & Hodge.

■ These claimants were retained before the enactment of 77B and did some research looking toward an equity receivership. They cooperated with Mr. Reath in the 77B proceeding, submitted a plan and obtained its approval by the Pennsylvania Public Service Commission. In so doing, the firm did most of the spade work necessary for the presentation to this Court and in general did a great deal of work directly beneficial to the company. However, in view of the non-beneficial nature of the early work in connection with the projected equity receivership, the full time (40 days) spent by the firm is not compensable. I fix the reasonable value of the services allowable in this proceeding at $3,500.

■ The claimants further ask for compensation for services in connection with the reduction of penalties upon state taxes. A member of the firm had several conferences with a tax expert and with officials of the Debtor and prepared briefs and memoranda. Together, they were successful in their efforts and saved the Debtor $25,000. The expert has already been paid a fee of $3,500. The reasonable value of the claimants' services in this connection is $2,000.

■ The third item of the application of this firm which must be discussed is the claim for work done by Mr. Hodge, another member of the firm, in connection with the Penfield wreck. Two of the Debtor's cars had collided and there were 67 passengers who, it was believed, might have claims. Liability could not be disputed. The Debtor had no claims department and retained private investigators with instructions to obtain releases where practicable. Fifteen claims were disposed of without any supervision on the part of the lawyers. Twenty-five others were disposed of for small amounts and involved little more than phone calls from the investigator requesting permission to pay the claims. The remaining 27 were of a more substantial nature and were finally settled for $16,741.50. In six of them, suits had been brought, three of which were defended by other counsel, although it was understood that Mr. Hodge would try all the cases. None came to trial. There were the investigations usual in negligence cases, supervised by Mr. Hodge,

and there was other work incident to the handling and settling of the claims. Mr. Hodge, who did similar work for insurance companies, ordinarily received $100 a day for actual trial. The work done was directly beneficial to the company and. I believe that its reasonable value under the circumstances was $3,000. There is an item of $2.90 for postage asked for as part of their expenses. This item should properly be absorbed in overhead and therefore must be disallowed. The balance of their application will be allowed.

### Pepper, Bodine & Stokes.

This firm in the early part of the proceedings represented the indenture trustee and certain bondholders who acted as an informal committee. Throughout the early stages of the reorganization this was the only bondholders' committee. The claimants did work in connection with the abortive 1935 and 1939 plans.

In 1945 the firm defended the Debtor's president against a claim by certain bondholders against him for profits derived from trading with the bonds of the company while it was in reorganization. Their representation of him does not affect their present claim. There was no conflict of interest, because the bondholders whom the firm originally represented had sold their bonds in September, 1943, some two years before.

The more difficult question is whether the fact that the firm represented both the indenture trustee and a group of bondholders makes it necessary to disallow the claim, and the answer depends entirely upon the scope of the decision of the Supreme Court in Woods v. City National Bank, 312 U.S. 262, 61 S.Ct. 493, 496, 85 L.Ed. 820. The Commission argues that that decision lays down the rule that an attorney who represents an indenture trustee at the same time that he is representing bondholders may not under any circumstances be allowed compensation from the estate. I do not think that it goes so far as that.

There are certain situations in which conflict of interest is always present, of necessity, arising from the nature of the interests themselves. Debtor and creditor, stockholder and bondholder or underwriter are illustrations of these. In such relationships actual conflict is conclusively presumed and the mere fact that counsel represents both sides is enough to forfeit his right to compensation.

In other cases, while conflict may arise, there is no conclusive presumption that the interests are hostile and whether or not a lawyer represents more than one party must be denied compensation depends upon the existence, as a matter of fact, of a conflict in each particular case. The mere possibility is not sufficient. As a matter of fact the possibility of conflict exists in almost every case of multiple representation. Thus, where an attorney represents a large number of individual bondholders there is always a possibility that a minority will find that their interests lie in one direction and the majority in another. When this situation arises the attorney may not continue to represent all but until it does it has never been suggested that his representation of the group is improper. Plainly, representing an indenture trustee and a group of bondholders is in this latter class. An indenture trustee, of course, must act for what it conceives to be the benefit of all the bondholders. There may be no division of opinion among them. So long as that is so, there is no actual conflict between its duty toward those whom it represents and its duty toward the bondholders as a whole. If diversity of aims arises between groups of bondholders there is, of course, no question that the dual representation becomes improper.

Returning to Woods v. City National Bank, supra, it will be seen that in that case, from the very beginning, counsel representing the indenture trustee was representing irreconcilably conflicting interests. The Court pointed out that the bondholders' committee which counsel represented was "in substance a part of the indenture trustee's reorganization division." That committee of five members two of whom were officers or employees of one of the principle underwriters of the bonds, which underwriter was, in addition, heavily interested in tthe equity. Two members were officers of the indenture trustee. Two members were also members of bondhold-

ers' committees for neighboring apartment properties and dominated the committees representing the bonds of those other companies. The Court said, "Beyond that is the fact that an indenture trustee closely affiliated with a committee shares the committee's conflicts of interest." There was more, but it is plain that the evidence of the relationship between the trustee and the committee made up of members with sharply divided loyalties was ample to support the finding of fact of the District Court, which the Supreme Court expressly referred to, that counsel for the trustee and the committee represented conflicting interests.

The point of the decision was that in such a case of actual conflict it is unnecessary to show fraud or mismanagement or injury to the estate. The whole decision is based upon the established fact that there was an actual conflict of interest, and a very serious one. In this connection the remark of Mr. Justice Jackson in Armour & Co. v. Wantock, 323 U.S. 126, 132, 65 S.Ct. 165, 168, 89 L.Ed. 118, is apposite: "It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading." There is nothing in the opinion in the Woods case to suggest that where no actual conflict of interest is shown to exist the mere fact of representation of both indenture trustee and bondholders requires that compensation be denied.

A further objection to the allowance of this claim or any part of it was entered by the Commission, upon the ground that the services were non-beneficial. It is true that the greater portion (although not all) of the work of these claimants was done in connection with the first and second plans neither of which resulted in a successful reorganization. I am not prepared to say that either of these two plans was, when presented, inherently unsound. The first failed because the debt burden to be carried by the new company was too heavy, in view of a marked recession in the company's business which occurred just about the time the plan was consummated. The second failed because the Pennsylvania Utilities Commission refused approval. Much of the work done by the claimants was beneficial in the sense that the two plans were steps in the evolution of the ultimately successful reorganization and the experience which was gained in formulating them contributed materially to the final result.

From the petition filed it appears that the active services of these claimants covered approximately a three-year period although they did some work from time to time after that. They attended 40 to 50 meetings including meetings with their own informal bondholders' committee. Their services were rendered on 180 different days and they wrote 379 letters. If the meetings attended averaged two hours their time would amount to, say 90 hours, plus whatever time was spent on the remaining 135 days on which they did some work. Although this represents a considerable volume of work, the negative results must be considered. On the whole, I think that an allowance of $7,500 is proper.

Barnes, Dechert, Price, Smith & Clark.

The $300 fee asked for by these claimants as counsel for the Girard Trust Company is allowed.

Bondholders' Committee and Counsel.

The bondholders' committee entered the picture at the time the third (1942) plan and the P. S. T. plan were before the Court. The old management and P. S. T. were at odds and the distribution of cash to the bondholders was rapidly being lost sight of. This committee, by an expert analysis of figures, brought the matter to the Court's attention and secured distributions on account of principal. They also recovered from some of the directors profits obtained from their dealings in the bonds of the Debtor in the amount of $38,076.44. The committee was very active and was successful in all that it attempted. It held 15 meetings and circularized the bondholders nine times to keep them advised of the progress of the re-

organization. Mr. Koegler was the most active member. I see no reason why $3,000 is not a reasonable allowance for the work done by him. Mr. Wyatt was also quite active and requests a fee of $2,250. His fee really consists of two components, his work as a committeeman and approximately 100 hours spent on accounting work. He has figured the accountant work at $10 an hour which makes a fee of $1,000, thus leaving his request for his committee work at $1,250. I think that the $1,000 requested is too high for accounting work done by this member of the committee in connection with his committee work for which he is also receiving compensation. I believe that $500 is proper, considering the quasi-public nature of the work and will allow a total fee of $1,750. Mr. Metzger was the least active of the committee but that does not mean that he did nothing. The entire committee appears to have been a very efficient and forceful one and unquestionably has done good work. Mr. Metzger asks $750 which I consider reasonable and will allow. The committee also asked for disbursements. I will allow $434.77, being the amount actually disbursed.

■ Counsel for the committee requests $15,000. On the basis of the time actually spent, this makes a higher per hour rate than I have ever allowed in reorganization, so far as I can recollect. It is argued that the fee is justified because a portion of the work was performed in the recovery of profits from the directors and that, since this was a new field, the litigation was difficult and also that compensation was in its nature contingent since, if it failed, there would have been no compensation for the work done. However, in reorganizations, fees cannot be allowed upon the same considerations as frequently govern in a lawyer's private practice. Mr. Maxwell's work was of very great benefit to the Debtor as pointed out in the discussion of the committee's work and I believe that a fee of $11,000 is proper—still rather high on a per hour basis, but justified in view of the fact that he was successful in all of his endeavors and that he did bring $38,000 into the estate by his suit against the directors. He asks for $50.49 for disburse-

ments. Two dollars and seventy-nine cents of this is for postage and is objected to by the Commission on the ground that postage should be absorbed in overhead. It will be disallowed. The balance is proper.

James M. Brittain and Frank M. Hunter.

The application is for legal services involving 1,650 hours of work. The claimants represented P. S. T. which purchased $800,000 of bonds in September, 1943. The Commission objects to any allowance on the ground that the interest of P. S. T. was in conflict with that of the bondholders. P. S. T. controlled the transportation in the suburban area served by the Debtor, except for the Debtor's 15 miles of railroad, and was undoubtedly desirous of getting control of the Debtor. It, therefore, intended and, in fact, offered to buy the Debtor's stock. The Commission argues that there was a conflict because P. S. T. would naturally desire to buy the stock at a low figure whereas the bondholders (who would all receive stock under the pending plan) would want to obtain as much as possible for it.

It is true that one of the chief features of the plan presented by these attorneys was the separation of the stock from the bonds, with the result that P. S. T. would be enabled to purchase the stock without buying bonds. However, the P. S. T. plan was in many respects more desirable than the third, or Conway, plan. The two plans were compromised and these claimants presented the resultant plan to the Pennsylvania Utilities Commission which rejected it but, on rehearing, reversed itself and approved it. The services of the claimants in this connection were able and expert and their entire work directly benefited the bondholders. No question of that fact is raised.

■ The whole thing comes down to the question whether generally beneficial services are non-compensable for the reason that the interests represented intend to expand their holdings in the company with the idea of obtaining control.

I see no reason why the allowance of fees from the estate must be limited to parties who have no object beyond salvaging their present holdings. A creditor may

properly participate in a reorganization in the belief that a sound plan can be worked out and that if it is done he will have a good investment. The purpose or desire to acquire a larger interest and to obtain control of the reorganized corporation does not, of itself, make his interest hostile to the others. An investor who intends to expand his holdings certainly should not be penalized in a reorganization.

However, in the work done by these attorneys there was a definite element of private, as distinguished from general representation—more pronounced than in the ordinary case. It is reasonable that they should look to their client for a portion of their fee.

■ I believe that a fee of $27,500 from the estate is reasonable under the circumstances and that amount will be allowed.

Jacob I. Weinstein and A. Jere Creskoff.

■ These claimants for attorneys' fees filed objections to the feature of the plan which provided for making the stocks and bonds inseparable. However, their objections were overruled and the plan approved. They also filed other objections all of which were overruled. Neither of these claimants had anything to do with the P.S.T. plan which provided for separation of bonds and stock. Of course, a claimant whose suggestion has been incorporated into a plan is not to be denied an allowance merely because his suggestion was not adopted when he presented it; but in this case the claimants' suggestion is a rather obvious one and little ingenuity, study or research on their part was needed. I do not think that they are entitled to anything like the amount they ask for. On the other hand, it should be said that there was no formal organization representing bondholders and in 1942 that their clients were the only bondholders who objected to the plan. In view of these facts I will allow them $1,000 and $275 respectively.

Norman J. Griffin and Reuben Singer.

■ These claimants appeared for a group of preferred stockholders in January, 1944, approximately 10 years after the inception of the reorganization proceedings. The time for appeal from the order determining insolvency had long since passed. Their efforts were to get the Court to reopen the proceedings in view of the increased business of the Debtor, in order to permit the stockholders to participate in the new company. They attended several hearings and did some research in checking over the proceedings in the court.

Only those who contribute to a reorganization are entitled to compensation and I do not think that a stockholder who attempts unsuccessfully to regain a portion of his former equity, eliminated beyond recovery by the Court's finding of insolvency, is entitled to compensation, since obviously he contributes nothing to the ultimate plan and is attempting to protect his own interests. The question might be a little different had these claimants come in before insolvency had been adjudicated or even before the reorganization had proceeded to the extent that it had. This claim is disallowed.

### Girard Trust Co.

In passing upon the claim of the Girard Trust Co. for allowance of compensation both as the agent for the Debtor under the first plan and as trustee under the mortgage of the new company, I am satisfied that, as urged by counsel for the Trust Company, the over-all picture should be examined and all of the services rendered should be considered. In its claim, the charge of 50 cents for receiving each bond and 50 cents for issuing each receipt for bonds is unquestionably higher than charges for similar services in comparable cases made by other institutions in New York. However, the Trust Company made no charge for maintenance of accounts which appears to be a customary charge and which has been allowed at 25 cents per account per year in two cases brought to my attention. In re Paramount-Publix Corporation, D.C., 12 F.Supp. 823, 832, and In re United Cigar Stores Co. of America, D.C., 21 F.Supp. 869, 877. In view of this, it is unnecessary to rule upon the claim item by item. I am of the opinion that the total charge for all services as agent for the Debtor under the first plan of reorganization is not unreasonable and it will be allowed.

The same considerations apply to the claim as trustee under the mortgage of the new company. The initial charge of $500 is materially larger than similar charges in selected typical cases submitted by the Commission. On the other hand, the annual charge for the maintenance of the trust is materially lower. Without approving the charge of $500 as reasonable I am willing to approve the entire arrangement as reasonable or as so slightly above what is reasonable as to make the difference de minimis.

### Drexel & Co.

 This firm acted as exchange agent in connection with the consummated plan of reorganization. Their charge is based on a rate of 40 cents per item for receipt of old bonds and stock and delivery of new bonds and stock. Again, this rate is higher than charges made by some other banks in New York to which my attention has been called by the Commission. However, under all the circumstances and taking into consideration the volume of the transactions involved and present-day costs of doing business, I am not prepared to say that the charge is unreasonable. It will be allowed.

### Fidelity-Philadelphia Bank & Trust Co.

The claim of this Company is for services as agent of the Debtor in the payment of coupons, in connection with the 7½ per cent interim distribution of principal and for services in connection with the cremation of the bonds and the release of the mortgage. The fee requested as agent for payment of coupons is one-fourth of one per cent on the total amount. The usual, and much more reasonable basis, is a charge per item, and I think the charge should be on that basis. The Commission recommends 5 cents per coupon as reasonable compensation and I think that recommendation is sound. As to the services in the payment of the interim distribution of principal, a comparison of charges for similar services made by leading banks and trust companies in New York in reorganization cases indicates that this charge is too high. Some of those cases involved much larger amounts and I appreciate the force of the Trust Company's argument that

some differential in favor of the services in making payment on smaller amounts is proper, and that will be taken into consideration. Also, the fact that services rendered in connection with a partial payment are more extensive than where obligations are redeemed or otherwise retired in their entirety. Taking all these conditions into consideration I allow this item in the amount of $1,500. The charge for release and satisfaction of the mortgage will be allowed at $100. The other charges are not objected to and are proper.

After having had to do with a number of these reorganizations in which claims for services by banks, transfer and exchange agents, etc., have had to be determined, I am impressed by the very great difficulty which confronts the Court in arriving at a reasonable figure, and I am ready to subscribe to the view which has been urged upon me in prior cases by the Commission that competitive bidding is a proper and desirable method of fixing compensation in such cases.