In re PANHANDLE PRODUCING & REFINING CO.

No. 1261.

District Court, D. Delaware.

Dec. 28, 1938.

908

Clarence A. Southerland (of Ward & Gray), of Wilmington, Del., and Scott McLanahan (of McLanahan, Merritt & Ingraham), of New York City, for debtor.

William S. Satterthwaite (of Satterthwaite & ·Foulk), of Wilmington, Del., and Solomon I. Sklar (of Hays, Wolf, Kaufman & Schwabacher), of New York City, for 8% Preferred Stockholders Committee.

Christopher L. Ward, Jr., of·Wilmington, Del., and William L. Bainton (of Bainton, McNaughton & ·Douglas), of, New York City, for Protective Committee for Common Stockholders.

Stewart Lynch (of Biggs & Lynch), of Wilmington, Del., for J. S. Judge and Thomas L. Holland.

NIELDS, District Judge.

February 10, 1937 debtor filed its original plan of reorganization and a hearing on the same was to be held March 26, 1937. Such hearing was adjourned from time to time until June 15, 1937. By the latter part of April debtor was encouraged to believe it could sell an issue of notes aggregating $600,000 at a lower rate of interest and under conditions more favorable than under the original plan. After negotiations with the private banking firm of Hall, Cherry, Wheeler & Co. (herein referred ·to as "the bankers"), that firm agreed to buy an issue of notes aggregating $600,000. Based upon this agreement debtor formulated an amended plan of reorganization and filed. the same June 15, 1937. This rendered the hearing upon the original plan unnecessary.

Hearing on the amended plan was set for July 19, 1937 and the debtor was authorized to solicit assents of creditors and stockholders. Assents were given by the necessary percentage of creditors and by the holders of a majority of the preferred stock of the debtor to the amended plan. Assents by holders of approximately 66,000 shares of common stock out of 198,770 shares were obtained. Debtor, however, was not able to secure assents from the holders of 51% of the common stock, because they were widely scattered throughout the United States. This amended plan of reorganization was referred to a special master to determine its fairness, equity and feasibility. And further to determine, if it should appear that less than a majority of the common stockholders had accepted the amended plan, whether that plan provided adequate protection to the common stockholders for the realization of the value of their equity, if any, in the property of the debtor.

The master held hearings, experts were produced and elaborate arguments were made followed by briefs. September 3, 1937 the special master reported that the amended plan was fair, equitable and feasible and that the holders of the· common stock had no equity in the property of the debtor yet under the amended plan

they were adequately protected. December 14, 1937 this report was confirmed, except as to a provision for stock purchase warrants to officers and employees which was eliminated.

September 13, 1937 the bankers in accordance with a provision of their contract of May 25, 1937 notified debtor of the cancellation of their contract. However, they proposed to pay for the notes in accordance with the contract within 60 days after the expiration of the time for filing an appeal from an order of confirmation of the master's report provided such order of confirmation be entered on or before September 27, 1937. This proposal was acceptable to the debtor and was approved by this court September 18, 1937. September 21, 1937, it appearing that no order of confirmation could be entered within the extended time, counsel for the debtor requested a further extension to October 9, 1937. The bankers agreed to this further extension. October 9, 1937 the agreement with the bankers terminated. October 13, 1937 the bankers offered to extend the date for carrying out their agreement for thirty days after the entry of a final order approving a plan of reorganization. Thereafter the bankers modified their proposal of October 13 and the offer so modified was finally approved by the court and the debtor was authorized to accept the same.

The foregoing recitals of changes and modifications relate to relatively immaterial matters. The undertaking by the bankers to purchase the note issue remained throughout but the bankers failed to perform their contract.

In February 1938 debtor employed one Higgins to procure another purchaser of the notes. Through the efforts of Higgins and persistent negotiations on the part of McLanahan, L. S. Carter & Co., (hereinafter called "Carter") agreed to become the purchaser of the note issue. This company agreed to pay $10,000 to the original bankers for the assignment of their underwriting agreement to Arnold Scheuer as nominee of Carter. Further negotiations between the new purchaser, Newberger, Loeb & Co. and Scheuer resulted in a satisfactory division of stock purchase warrants among them. As a result Carter agreed to purchase the notes without any substantial modification of the amended plan of reorganization which relieved the debtor of resubmitting the amended plan to stockholders and creditors. Throughout the negotiations with both bankers numerous minor modifications of the amended plan were agreed upon.

The purchaser of the notes refused to consummate the purchase unless the stock should be listed on the New York Stock Exchange. The preparation of the listing papers and the presentation of the same to the Stock List Committee by McLanahan entailed laborious efforts but were successful. Finally the amended plan with numerous modifications was submitted to the court and an order was entered June 25, 1938 approving the amended plan as modified.

Petitions have been filed for allowances amounting to approximately $137,000.

McLanahan, Merritt & Ingraham, counsel for debtor, petition for $50,000.

The debtor was a relatively small company. The most significant service was the sale of the note issue. Reorganization was dependent thereon. Debtor has been enabled to discharge its liabilities, to relieve itself from the intolerable provisions of its charter respecting preferred stock and to resume business with adequate working capital.

At every step in these reorganization proceedings the firm of McLanahan, Merritt & Ingraham led the way. The firm was continuously engaged from February 1937 until July 1938; a period of over one year and a half. The path of debtor was strewn with heartbreaking incidents which only tenacity and courage could overcome. This firm was responsible for the amended plan of reorganization, and its acceptance and successful consummation. The high spots of their service were: (1) Proceedings initiated and concluded which obviated the necessity of obtaining the assents of a majority of the common stockholders. Without such proceedings the plan would probably have failed because the common stock was very widely distributed and the committees representing that stock were opposed to the plan. (2) Listing of the new common stock on the New York Stock Exchange. (3) The sale of the issue of $600,000 of notes. (4) Drafting and redrafting the trust indenture involving unusual provisions covering "oil run receipts". (5) Closing the transaction, requiring the drafting of a vast number of

papers. For its services this law firm will be allowed thirty-seven thousand five hundred dollars ($37,500) and one thousand forty-two dollars and thirty three cents ($1,042.33) for expenses.

Ward & Gray, local attorneys for the debtor, petition for $7,500. Their co-operation with the principal attorneys for the debtor and in particular their participation in hearings before the special master warrant the court in allowing them five thousand dollars ($5,000) and five hundred twenty-seven dollars and thirty-five cents ($527.35) for expenses.

A committee for holders of 8% Cumulative Preferred Stock and their counsel petition for an allowance. The chairman of the committee was the only member who appeared at the hearing. It represented at most 3,666 preferred shares, of which at least 2,000 were owned by members of the committee. Otherwise the committee represented only five persons having about 500 shares, and two brokerage houses which presumably were the holders of stock belonging to members of the committee. It is thus evident that the committee was acting primarily in its own interest and only incidentally for preferred stockholders in general. The main effort of the committee and of its counsel was to defeat the various plans. Their only possible constructive service was uniting with others in eliminating the provision for stock purchase warrants to officers and employes of the debtor. For any services beneficial to the estate the committee will be allowed five hundred dollars ($500) and two hundred fifty-four dollars and two cents ($254.02) for expenses. The attorneys for the committee will be allowed fifteen hundred dollars ($1500) for services and one hundred twenty-seven dollars and fifty-four cents ($127.54) for expenses.

Bernstein & Bernstein as attorneys for the holders of 2,500 shares of preferred stock ask for an allowance of $250 for expenses. There is evidence in the record of cooperation on the part of this law firm. It makes no request for an allowance for services. Its expenses of two hundred fifty dollars ($250) will be allowed.

Two members of a protective committee for common stock and their counsel petition for an allowance. This committee represented a small group of common stockholders who had no real interest in the reorganization. At various stages it vigorously resisted the plan of reorganization as according too little to the common stockholders. The activities of the committee and its counsel were principally obstructive and under the authorities are entitled to no allowance for services or expenses. In re National Department Stores, D.C., 11 F.Supp. 633; In re Celotex Co., D.C., 13 F.Supp. 1011, 1016.

Romeo Muller was secretary of a second stockholders' committee which supported the debtor in recommending the plan of reorganization. He and his associates were of assistance to the debtor in presenting the true facts concerning the reorganization and thereby procuring assents to the plan. Muller acted as a disinterested advisor and was of material aid in the reorganization. He asks nothing for his services. His expenses of two hundred three dollars ($203) will be allowed.

Arnold L. Scheuer petitions for an allowance of $35,000. In March, 1937 he heard that the debtor was being reorganized and called on its attorneys. He stated he could arrange the purchase of $500,000 of notes. Later he introduced Hall, Cherry, Wheeler & Co. to counsel for debtor. The bankers requested that the issue of notes be for $600,000.

Incidentally it appears that there was an agreement between Scheuer and the bankers by which the bankers agreed to give Scheuer 20,000 stock purchase warrants from the warrants to be received by them under the underwriting and also 10% of their cash profits. Newberger, Loeb & Co., New York brokers, apparently for the reason that they were "friends" of Scheuer, were to receive 20,000 additional stock purchase warrants. Following the stock market rescession in the Fall of 1937, the bankers declined to proceed with the underwriting and McLanahan started his negotiations with Carter. McLanahan introduced Scheuer to Carter and arranged that the bankers in consideration of the sum of $10,000 advanced through Scheuer to Carter, should assign their underwriting agreement to Scheuer as Carter's nominee. Carter bought and paid for the notes. Scheuer, pursuant to an arrangement with Carter, received 15,000 of the stock purchase warrants from Carter. Newberger, Loeb & Co., Scheuer's

"friends", received 17,500 additional warrants.

No allowance should be made to Scheuer for the following reasons: Section 77B(c) (9), Bankr.Act, 11 U.S.C.A. § 207(c) (9), permits the court to allow compensation only to five classes of persons: (1) officers; (2) parties in interest; (3) depositaries; (4) reorganization managers and committees or other representatives of creditors or stockholders; and (5) attorneys or agents of any of the foregoing and of the debtor. Scheuer fits into none of these classes. He can not be classified as a party in interest. He admitted he had no contractual relation with the debtor and never had any interest in its estate.

Apart from the statute, Scheuer rendered no service from which a promise, expressed or implied, on the part of the debtor to pay for his services could be presumed. Scheuer testified that he had "no authorization or request from [the debtor] for you to render services to the company". Scheuer carefully arranged in writing for his compensation from the bankers yet he never mentioned to McLanahan or to the debtor that he would ask for compensation from the debtor. It was not until after the plan had been consummated that he suggested to McLanahan he might ask for compensation. It is obvious that Scheuer expected to be compensated by the underwriter. In fact he was so compensated. Having obtained compensation from one party to the agreement he can not receive compensation from the other party. For the several reasons above stated no compensation should be allowed Scheuer.

■ Coudert Brothers ask for an allowance of $20,000. They were counsel for Carter who furnished the $600,000 to purchase the notes. Finletter of this firm testified: "My firm was called in to advise Mr. Carter as to the proper steps to be taken to enable him to purchase the notes of the company, specifically to re-shape certain aspects of the set-up on the notes so that it would be satisfactory to Mr. Carter, and to those to whom he was proposing to sell the notes." Coudert Brothers are not persons to whom an allowance can be made under Section 77B(c) (9). Their services were rendered to their own clients and for their benefit exclusively. They recognize that they can be compensated out of the estate only if they can be classed as "attorneys for a party in interest" as that term is used in subsection (c) (9). They argue that Carter became a party in interest when it acquired the bankers' agreement. The phrase "parties in interest" was interpreted by Judge Coxe in Re Paramount-Publix Corporation, D. C., 12 F.Supp. 823. He stated [page 827]: " * * * the words, 'parties in interest' plainly refer to creditors, stockholders, or other persons having claims against, or interests in, the company or its property, other than those represented by 'committees or other representatives of creditors or stockholders.'" This court has passed adversely upon a similar claim. In re Celotex Co., D.C., 13 F.Supp. 1011. The court stated [page 1014] "services for the subscriber cannot form the basis of an allowance in these proceedings". In any event Coudert Brothers were retained by Carter as its attorneys in the purchase of the notes for which Carter received from the debtor a $42,000 cash discount and 120,000 stock purchase warrants. The underwriters' attorney certainly should look to the underwriter rather than to the debtor for compensation.

■ Bingham, Dana & Gould petition for an allowance of $1,500 as attorneys for First National Bank of Boston. This bank took one-half of the note issue from Carter at par. Everything said with respect to the claim of Coudert Brothers applies to this claim. It applies with greater force because this Boston law firm never had a direct relation of any description with the debtor. Their services were rendered exclusively for the benefit of the Boston bank. Lowell, a member of the firm, testified that his firm "represented the lender alone",—First National Bank of Boston, and that he wanted to see that the papers "were in the best possible shape for the benefit" of his client, the Boston bank. Neither the plan of reorganization nor the underwriting agreement contemplated that a National bank should become a purchaser from the underwriter of any portion of the notes. When a National bank became such purchaser the redrafting of the papers to meet the requirements of such purchaser was for the accommodation of the underwriter who desired to resell half its purchase to the bank. The changes suggested by Lowell were solely for the protection of his client and for the benefit of the underwriters. The compensation for such legal services should

be paid either by the bank or by the underwriter.

Thomas L. Holland and John S. Judge have each filed a claim in the amount of $2,000 for services rendered prior to the commencement of the 77B proceeding. In March, 1936 the treasurer of the debtor suggested to Holland and Judge that they attempt to secure from stockholders assents to a voluntary plan of reorganization. They spent about a week in obtaining assents. This ended Judge's activities. Holland, however, subsequently spent two weeks in Wichita Falls studying debtor's properties. Until the company retained McLanahan, Holland acted in the capacity of New York representative of the debtor. It recognizes that considerable services were rendered to the debtor by Holland during this period at the debtor's request. The claim of Judge should be allowed in the sum of two hundred eighty dollars and sixty-one cents ($280.61) and the claim of Holland should be allowed in the sum of one thousand seven hundred nineteen dollars and thirty-nine cents ($1,719.39).

An order may be submitted.