### In re NATIONAL DEPARTMENT STORES, Inc. (two cases).

### In re TECH CORPORATION.
#### No. 966.

District Court, D. Delaware.
July 1, 1935.

See, also, 8 F. Supp. 19; 11 F. Supp. 101.

Jacob Demov, of New York City, and Reuben Satterthwaite, Jr., of Wilmington, Del., for trustees.

## NIELDS, District Judge.

National Department Stores, Inc., has been administered by this court in bankruptcy for almost two and a half years. The successive steps of administration were by bankruptcy receivers from February 6, 1933, until June 30, 1933; by bankruptcy trustees from June 30, 1933, until June 12, 1934; and by trustees under section 77B, Bankr. Act (11 USCA § 207) from June 12, 1934, until the present. In this proceeding Tech Corporation, a subsidiary of National Department Stores, Inc., was also administered by this court from February 26, 1935, until the present. April 19, 1935, a plan of reorganization was approved. Throughout this opinion the word "debtor" refers only to National Department Stores, Inc.

Allowances heretofore paid and other allowances now claimed by receivers and their attorneys, by trustees and their general and special attorneys, by the debtor and its attorneys, by reorganization managers and their attorneys, by a creditors' committee and its attorneys, by attorneys of a second creditors' committee, and by a stockholders' committee and its attorneys, and by accountants, auditors, and tax consultants aggregate approximately $1,500,000. Claims to which objections have been filed with the amounts heretofore paid and the additional amounts requested to be paid are as follows:

| | Amount paid | Additional amount claimed |
|---|---|---|
| Harry H. Schwartz, coreceiver and cotrustee | $ 35,000 | $ 110,000 |
| Joseph Bancroft, cotrustee | | 55,000 |
| Samuel C. Lamport, cotrustee | | 55,000 |
| Reuben Satterthwaite, Jr., general attorney for trustees | 25,000 | 100,000 |
| Jacob S. Demov, associate general attorney for trustees | 25,000 | 295,000 |
| Charles F. C. Arensberg, attorney for receivers and trustees at Pittsburg | 1,800 | 26,000 |
| Edgar A. Hahn, attorney for receivers and trustees at Cleveland | 10,800 | 20,000 |
| Stevenson, Butzel, Eaman & Long, attorneys for trustees at Detroit | | 14,000 |
| Clark R. Fletcher, attorney for trustees at Minneapolis | | 22,500 |
| Carter & Jones, attorneys for receivers and trustees at St. Louis | 3,600 | 3,600 |
| Morton Stein, attorney for receivers and debtor at New York | 22,500 | 75,000 |
| Richards, Layton & Finger, attorneys for receivers and debtor at Wilmington | 18,000 | 17,500 |
| Wolf, Block, Schorr & Solis-Cohen and Hirshwald, Goff & Rubin, attorneys for trustees at Philadelphia | | 5,000 |
| Phillips B. Scott, Pennsylvania Tax attorney | | 3,000 |
| Alter, Wright & Barron, attorneys for Tech Corporation at Pittsburg | | 5,000 |
| Samuel D. Leidesdorf and Robert C. Adams, reorganization managers | | 20,000 |
| White & Case, attorneys for reorganization managers | | 90,000 |
| Advisory Merchandise Creditors' Committee, Mortimer J. Davis, Secretary | | 10,000 |
| Otterbourg, Steindler & Houston, attorneys for advisory merchandise creditors' committee | | 65,000 |
| Edward B. Levy and Joseph Handler, attorneys for a second merchandise creditors' committee | | 10,000 |
| Samuel Ungerleider, Robert C. Adams, E. S. Hanson, Philip W. Russell and Hugh W. Long, stockholders' committee | | 25,000 |
| Weil, Gotshal & Manges and John Biggs, Jr., attorneys for stockholders' committee | | 60,000 |
| Dunbar & Dubail and Charles R. Judge, attorneys for two stockholders | | 150 |
| | $141,700 | $1,086,750 |

National Department Stores, Inc., was incorporated in 1922 and operated either as a holding or operating company a chain of eighteen department stores. These stores were located in Portland, Or.; Houston and San Antonio, Tex.; Minneapolis; Detroit; Cleveland; two in Wheeling; Memphis; St. Louis; three in Pittsburg; Atlanta; Richmond; Trenton; and two in Philadelphia. Merchandise of all kinds was purchased for these stores through an executive and central office in New York. To this office reports were sent from time to time from the various stores. The officers, managers, and employees of the subsidiary corporations and units of the debtor called there for the purpose of exchanging views, determining questions of policy, submitting budgets, and making purchases. Practically all important documents were kept in the New York office. That office is the clearing house for the business of the debtor. The chain of stores employed upwards of 7,000 people and furnished an outlet of business to over 30,000 supply houses. The annual sales volume during the two and a half years of bankruptcy administration was about $40,000,-000. The major problems involved the abandonment of properties, revamping of leases, and rehabilitating credit. The solution of these problems required high talent and a vast amount of work in many mercantile centers of the country. The work was crowned with substantial success. This is demonstrated by the conversion of a loss at the beginning of the administration into a profit at the present time. The reduction of the claims as filed by several million dollars was a notable accomplishment. From the start, the problem of reorganization was considered by all parties in interest. Owing to the depression, efforts to obtain financial aid from private bankers proved futile. Liquidation appeared inevitable until the passage of section 77B. In the fall of 1934, necessary aid was afforded by the Reconstruction Finance Corporation. Thereafter an operable plan of reorganization was drafted. When the required acceptances were obtained, the plan was approved by this court.

Technically, this proceeding may be divided into three periods, but actually the proceeding involves the same estate pending before the same court with identical creditors and stockholders. The services were practically continuous throughout the whole period and related largely to the same matters. At the conclusion of the bankruptcy receivership, allowances were made by the special master and his report thereof was confirmed by this court. These allowances appear under the head "paid" at the beginning of this opinion. A consideration of the full record proves the allowances of the special master excessive.

■ The amount of fees to be charged against a bankrupt estate is an expense of administration subject to examination and approval of the court. At any time before the closing of the estate and on its own motion the court may review and re-examine allowances paid to trustees and attorneys and make such final disposition of the matter as the equities of the case require. The mistake made by the court in approving the report of the special master is not irreparable and must be corrected at this time. An allowance to each person now seeking compensation should be considered as one allowance for the entire period of his service. I have therefore considered the record of allowances before the special master, together with the testimony during the five-day hearing in open court.

■ The court is not without instruction in making allowances. Last April the Supreme Court declared: "Extravagant costs of administration in the winding up of estates in bankruptcy have been denounced as crying evils." Realty Associates Securities Corp. v. O'Connor, 55 S. Ct. 663, 665, 79 L. Ed. 1446. A year ago Congress, in enacting section 77B, provided: "The compensation allowed a receiver or trustee or an attorney for a receiver or trustee shall in no case be excessive or exorbitant, and the court in fixing such compensation shall have in mind the conservation and preservation of the estate of the bankrupt and the interests of the creditors therein." Act June 7, 1934, § 3 (11 USCA § 76a). Recently our own Circuit Court of Appeals adopted language of the Supreme Court: "We were desirous of making it clear by our action that the judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance." In re Gilbert, 276 U. S. 294, 48 S. Ct. 309, 310, 72 L. Ed. 580. The Circuit Court of Appeals followed with the words: "This warning of the Supreme Court against 'vicarious generosity' has also been sounded by other federal courts." Bailie v. Rossell (C. C. A.) 60 F.(2d) 806, 807. Formerly, the idea prevailed that attorneys were entitled to

638

greater compensation when employed in a receivership or bankruptcy case than when serving private interests. In reality, receivers and attorneys are officers of the court. As public servants, their compensation should never be as large as the compensation of those engaged in private employment. By such considerations, debtors may be relieved and creditors and stockholders served.

■ Applying these general principles to the protracted painstaking, and for the most part excellent service rendered by petitioners, it is apparent the allowances claimed are excessive and in certain instances exorbitant. Valuable services were rendered. Those who rendered such services are entitled to fair compensation. Where numerous persons participate in rendering one service susceptible of being rendered by one person, needless duplication results which should not form the basis of compensation. This evil is well illustrated in this case.

In the following recital of services under the names of the various petitioners, there is no attempt to make a full and detailed recital of services. To do so would unduly prolong this opinion and serve no useful purpose.

Allowances.

■ Harry H. Schwartz was employed by debtor for a year and a half before bankruptcy at an annual salary of $25,000 with an option on 10,000 shares of debtor's common stock. As the active receiver and trustee for two and one-half years, he shouldered the burden of operating the numerous enterprises of debtor and effectively assisted in its rehabilitation and reorganization. His services to the estate are worth $25,000 per year. After deducting the $35,000 received, there should be paid to him the sum of $27,500.

■ Joseph Bancroft and Samuel C. Lamport were cotrustees with Schwartz. As Schwartz was the active trustee, his cotrustees were relieved from personal participation in operating the chain of stores. Their character, experience, and advice were helpful. Bancroft was more constant in his attention to the work and should be allowed somewhat higher compensation than Lamport. Eighteen thousand dollars should be paid to Bancroft and twelve thousand five hundred dollars to Lamport.

■ Reuben Satterthwaite, Jr., served as general counsel of the trustees for approximately two years. During the first year he devoted about 80 per cent. of his time to this business and during the second year about 50 per cent. He received daily reports from his cocounsel in New York for his own use and the use of the cotrustee resident in Wilmington. He attended the twenty meetings of the trustees. He obtained orders from the court upon many petitions drafted in large part by others. It does not appear that he actively negotiated in solving the major problems. He shared with the assistant general attorney of the trustees in scrutinizing the claims and in filing exceptions. He has received $25,000 and should be paid an additional amount of $12,500.

■ Jacob S. Demov was associate general counsel for the trustees. A study of the petitions, record, and testimony shows that the major part of the services performed by general counsel for the trustees was performed by Demov. He was in New York, close to the office of the debtor and within easy access of the trustees and store managers. A report of matters handled by Demov and copies of correspondence were sent to his cocounsel in Wilmington and to the trustees. From the start, he was occupied with the problem of reducing rents in some seventy-five leases and in negotiating use and occupation agreements. With local counsel he attended hearings in connection with leases in Trenton, Minneapolis, Detroit, Pittsburgh, Cleveland, St. Louis, and Philadelphia. The local counsel in these cities have been paid or are asking handsome allowances for the results of the hearings. Attempts were made to segregate the assets in the local jurisdictions of each of the stores. Demov, with the aid of local counsel, obtained possession of the assets from ancillary receivers in Philadelphia, Minneapolis, and Detroit. He gave instructions to the various local counsel in jurisdictions where the stores were located.

Demov conducted the greater part of the litigation before the referee. He made an analysis of upwards of 4,000 claims filed with the referee. Eighteen hundred and sixty-eight of these claims were compromised through conference and correspondence. Comparatively few claims were submitted to the referee or special master for determination and none were reviewed by the District Court or by the Circuit

Court of Appeals. As a result of his efforts, the general claims were reduced by over $2,000,000. Demov attended all meetings of the trustees which numbered about twenty and were held in New York, Philadelphia, and Wilmington. He drafted the minutes of the meetings. He prepared numerous reports and petitions filed in these proceedings. He has served the trustees efficiently for two years. He has been paid $25,000. Upon the basis of an annual salary of $30,000, there is now due him the sum of $35,000.

Charles F. C. Arensberg was local counsel for the receivers and trustees of the debtor at Pittsburg. There the debtor was burdened with complicated leases. Petitioner participated in negotiations in the revamping of the Frank & Seder and Rosenbaum leases, in the preparation of use and occupation agreements, and in communications leading to the settlement of contingent claims of landlords. Claims investigated included DeRoy, Mellon, and Acheson claims. The last is the principal claim and remains unsettled. Petitioner attended probably twenty hearings in the Tech receivership proceedings and reported events to general counsel for the debtor and trustees. He has been paid $1,800 and in view of the services rendered should receive an additional sum of $10,000.

[10] Edgar A. Hahn was local counsel of the receivers and trustees at Cleveland. He had been local attorney for the debtor for many years. His services extended over a period of about two and one-half years. They involved correspondence, drafting agreements, notices, and pleadings, and trips to New York, Wilmington, Wheeling, Columbus, Cincinnati, and Dayton. He participated in negotiations for the settlement of rents and the making of new leases. He has received $10,800 and has earned an additional sum of $10,000.

Stevenson, Butzel, Eaman & Long were local counsel for the receivers and trustees in Detroit. Here again the problems were the lease situation and an ancillary receivership. Numerous interests in the leases required the drafting of seven different agreements. The services included conferences and correspondence about tax claims of the city of Detroit. Trouble with labor unions had to be ironed out and important claims compromised. Options for continuance of leases were obtained. Petitioners have received $11,000 and in addition should be paid $7,500.

Clark R. Fletcher was local counsel for the trustees at Minneapolis. Here also ancillary proceedings and leases were the problems. Petitioner acted as counsel for the ancillary receivers in Minneapolis and was paid a fee of $18,000 in that proceeding. Through that appointment he came to represent E. E. Atkinson & Co., a wholly owned subsidiary of debtor. Representing that company he recovered judgment in the Neisner action for rent. Petitioner deducted $25,000 as a fee from the amount recovered in that action and remitted to his client the balance. The Neisner trial consisted in taking formal proof on behalf of the plaintiff. The trial court refused to permit defendant to introduce any proof under the pleading. This ruling was affirmed on appeal. Petitioner has received $43,000 in fees. A further allowance of $5,000 will fully compensate him for all of his services.

Carter & Jones were local counsel for the receivers and trustees at St. Louis. They rested upon their petition for an allowance of $3,600 and submitted no testimony in support thereof. They have received $3,600. Upon consideration of their petition I consider them entitled to a further allowance of $1,400.

Morton Stein was counsel for the receivers and for the debtor. He had been a director, member of the executive committee, and treasurer of the debtor until 1931. Thereafter he continued its general counsel. He was familiar with the set up, personnel, and operations of the entire chain of stores. In addition, he knew personally the landlords and the trustees for bondholders. Petitioner advised the receivers respecting the abandonment of property, the disaffirmance of leases, and about the credit situation. He procured an order of court subordinating obligations of the debtor against its subsidiaries to claims of creditors. During the trusteeship petitioner went to St. Louis with others and helped settle the claims of landlords and the claims of Nugent Realty Company bondholders and of Giblin bondholders. He aided also in revamping the Frank & Seder leases, in reducing rents, and in canceling landlord claims. His records show that he devoted to the affairs of debtor 1,508½ hours; that he conferred with 118 persons; and that in all the number of con-

ferences were 709. His acquaintance with the landlords and representatives of bond-holders materially assisted in procuring acceptances of the plan of reorganization. Immediately before bankruptcy, he was under a general annual retainer of $22,500. He has been paid $22,500 and is entitled to receive $27,500 in addition.

Richards, Layton & Finger were local attorneys for the receivers and for the debtor at Wilmington. As such, they rendered effective service. They have been paid $18,000 and should receive $7,000 in addition.

 Wolf, Block, Schorr & Solis-Cohen and Hirshwald, Goff & Rubin were attorneys for the ancillary receivers in Philadelphia. They were allowed $60,000 for their services. Turning over the assets by such receivers to the trustees was incidental to the closing of the receivership estate. Petitioners' services incident thereto were fully covered by the allowance made in the ancillary receivership. No further allowance should be made.

Phillips B. Scott, tax attorney in Pennsylvania, petitioned for an allowance of $3,000 and has sustained his petition by oral proof.

 Alter, Wright & Barron were attorneys for Tech Corporation at Pittsburg. In the Tech receivership proceedings in the Western district of Pennsylvania these petitioners were allowed $80,000. They prepared a creditors' petition under section 77B against Tech while acting as attorneys for receivers of Tech and submitted the same to the Chase National Bank of New York, a large creditor of Tech. Thereafter they delivered the petition to another attorney who filed the same in Pittsburg for the petitioning creditors. An examination of the record shows that any services on behalf of Tech Corporation in the section 77B proceeding in this district were trifling in character. For such services, the court allows the sum of $500.

Samuel D. Leidesdorf and Robert C. Adams were reorganization managers. The court had the opportunity of hearing both petitioners testify about their services as managers and awards to each the sum of $5,000.

 White & Case were attorneys for the reorganization managers. Their services cover the entire period of two and one-half years and were of high quality. The

preservation of this estate for the benefit of its creditors and stockholders necessitated the elimination of claims by litigation and adjustment; the settlement of large disputed claims by negotiation; negotiations for reduced rentals; negotiations for renewed leases; obtaining new money for working capital; the formulation of a proper plan of reorganization; and obtaining assents to the plan by creditors and stockholders. In the accomplishment of this purpose petitioners were the indispensable agents. Briefly, the causes of bankruptcy were: (a) Loss of adequate working capital due to losses in operations resulting from decline in sales; (b) unprofitable stores in St. Louis and Pittsburg; (c) failure to obtain bank credit or extension of existing bank indebtedness; (d) failure to obtain satisfactory merchandise and trade credit; (e) burdensome leases; and (f) burdensome fixed charges in connection with bonds, mortgages, and other long term indebtedness. Relief from these oppressive conditions had to precede the formulation and approval of a plan of reorganization. The credit of furnishing this relief is primarily attributable to petitioners, yet the full accomplishment of the results obtained was due to the effective co-operation of Schwartz and other petitioners. Throughout the entire period of two and one-half years petitioners were engaged in the task of formulating an acceptable plan of reorganization. This involved the formulation of numerous plans and reconciling, through skillful negotiation, diverse interests. This skillful and difficult work was primarily performed by Col. Hartfield. He enlisted the aid of the Reconstruction Finance Corporation which resulted in a commitment for a loan of $2,250,000. He negotiated with the creditors' and stockholders' committees and other interested parties until far more than the required number favored his plan. For these constructive services, petitioners should be paid $62,500.

 Mortimer J. Davis was secretary of the advisory merchandise creditors' committee. He is associated with a credit organization or adjustment bureau in New York which is very active in bankruptcy proceedings. The services and facilities of that association were furnished through Davis to the creditors' committee. These services, however, are compensated by the expenses allowed to the petitioner in the

sum of $3,847.02. For his services as secretary of the committee, Davis should be paid $1,000.

■ Otterbourg, Steindler & Houston were attorneys for the advisory merchandise creditors' committee. That committee was organized about February 6, 1933. By advertisements and circulars petitioners communicated with merchandise creditors of the debtor and procured numerous proxies. The committee represented 1,981 creditors of debtor with claims aggregating $447,250.26 and 575 creditors of Tech with claims aggregating $124,161.33. Petitioners took an active interest in the affairs of the debtor by attending conferences, appearing in court in Pittsburg and Wilmington, and participating in various hearings. In the Acheson and in other proceedings they filed independent briefs. They appeared and participated in the examination of witnesses at the hearing in Pittsburg on allowances in the Tech receivership proceeding. Representing creditors they participated in the formulation of the plan of reorganization and made many suggestions which were adopted in whole or in part. Petitioners communicated with the creditors concerning the plan and furnished them with copies of their opinion with respect thereto. They were of great assistance in procuring acceptances of the plan by merchandise creditors. For their services, they should be paid $25,000.

■ Edward B. Levy was attorney for a second merchandise creditors' committee. This committee was not authorized to intervene in this proceeding until February 19, 1935. It was organized subsequent to the organization of the advisory merchandise creditors' committee. After the filing of the 77B petition in this court, Levy, in association with another New York lawyer, filed an involuntary petition against the debtor under section 77B in the Southern District of New York without the knowledge of the debtor. This petition was dismissed. The record fails to disclose a reason for the organization of a second creditors' committee. Its interests were identical with the interests of the creditors' committee already organized which was fully cooperating with the trustees, the debtor, and the reorganization managers. In view of all the circumstances, the court feels that no allowance should be made to this committee or its counsel.

■ Samuel Ungerleider, Robert C. Adams, E. S. Hanson, Philip W. Russell, and Hugh W. Long constituted a stockholders' committee. This committee held no fixed or organized meetings. It received no deposits of stock. From the petition and testimony, it is difficult to determine what services were rendered by the committee. Mr. Adams has waived any fee as a member of this committee. The record only justifies a nominal allowance of $1,000 to each of the four remaining members of the committee.

■ Weil, Gotshal & Manges and John Biggs, Jr., were attorneys for a stockholders' committee. It is difficult to grasp from the record what services were rendered and what results were obtained by petitioners. The time actually spent by them on behalf of the committee does not clearly appear. The day sheets are brief and do not indicate services of a substantial character. Petitioners did co-operate with their committee in procuring the assent of stockholders to the plan of reorganization. For all their services, they should be allowed the sum of $5,000.

■ Dunbar & Dubail and Charles R. Judge, attorneys for two stockholders, petitioned for an allowance of $150 for examining and filing objections to the plan of reorganization. The estate was in no way benefited and no allowance should be made.

Accountants, auditors, and tax consultants have petitioned for payment of their services. An examination of the record discloses that the services set forth were rendered and that the amounts claimed should be paid.

It is unnecessary to consider in detail the expenses claimed in the various petitions filed. Adequate proof was furnished relating to these expenses and in each and every instance they should be paid.

An order in accordance with this opinion may be submitted.