In re DONAHOE'S, Inc.

**In re GEO. K. STEVENSON CO.**
**No. 1232.**

District Court, D. Delaware.
Oct. 16, 1939.

680

Stewart Lynch, of Wilmington, Del., and J. H. Rosenbaum, of Washington, D. C., for debtor.

A. Leo Weil, Jr. (of Weil, Christy & Weil), of Pittsburgh, Pa., and Howard Duane, of Wilmington, Del., for Independent Stockholders' Committee.

A. E. Kountz (of Kountz & Fry), of Pittsburgh, Pa., and Ward & Gray, of Wilmington, Del., for Unsecured Creditors' Committee.

Howard Zacharias, of Pittsburgh, Pa., and Ivan Culbertson, of Wilmington, Del., for New York Life Ins. Co.

Fleming Nevin (of Marshall, O'Brien & Nevin), of Pittsburgh, Pa., for mortgage creditors.

Eli E. Reich (of Reich & Reich), of Pittsburgh, Pa., and Thomas Herlihy, Jr.,

of Wilmington, Del., for Stockholders Preferred and Class A Protective Ass'n.

Charles H. Tuttle (of Breed, Abbott & Morgan), of New York City, for Stemmler & Co.

NIELDS, District Judge.

Hearing on petitions for allowances.

March 23, 1936, Donahoe's, Incorporated, conducting a large and popular grocery business in and about Pittsburgh, Pennsylvania, filed its petition for reorganization in this court under section 77B of the Bankruptcy Act, as amended, 11 U.S.C.A. § 207. May 31, 1936 Geo. K. Stevenson Company, a wholly owned subsidiary of the debtor, filed in that proceeding its petition for reorganization under the act. The debtors were continued in possession.[1]

A plan of reorganization dated November 30, 1936, and later amended was proposed by the debtor. After hearing, this plan was approved by the court January 29, 1937. D.C., 19 F.Supp. 441. Under this plan debtor was to issue first mortgage bonds in the amount of $2,500,000. With the proceeds of such issue it was proposed to pay off the mortgage creditors in full, to give the unsecured creditors 95% of the face of their claims and to reform the stock structure of debtor. It was found impossible to finance this plan and it was abandoned.

Between November 30, 1936, the date of the first plan, and April 1, 1939, when the second plan of reorganization was filed, debtor demonstrated remarkable recuperative power by earning a substantial net profit. Besides meeting current obligations, debtor paid 40% of the amount due the unsecured creditors. All overdue mortgage interest was liquidated and something on account of the principal was paid. This conduct of the debtor so favorably impressed the New York Life Insurance Company, holder of a million dollar mortgage, that, after negotiations, it was willing to extend the mortgage for 10 years at a reduced rate of interest. The attitude of this principal creditor was the heart of the second amended plan of reorganization.

April 1, 1939, the debtor filed a second amended plan. This plan provided for extension agreements by the mortgage creditors and the payment of unsecured creditors. It incorporated the treatment accorded stockholders in the abandoned plan, ex-

[1] Hereafter in this opinion the two debtors will be referred to as "debtor".

cept it provided for less outstanding common stock. The provision for 125,000 shares of common stock to be distributed to purchasers of first mortgage bonds and 135,000 shares of common stock to be issued to the bankers under the first plan was omitted from the second plan. May 19, 1939, this amended plan was given a hearing and thereafter confirmed by the court.

At the hearing the treasurer of the debtor testified that debtor had approximately $200,000 cash on hand. For the nine months of the current year he testified the debtor had made approximately $50,000 after the payment of interest and depreciation. He further testified that the debtor should always have on hand approximately $100,000 in cash to sustain the necessary inventory.

Twenty-five petitions for allowances have been filed in this proceeding. They are tabulated in a foot note.[2] The total

| [2] Petitioner | Fees | Expenses |
|---|---|---|
| Attorneys for Debtor | | |
| Stewart Lynch | $15,000.00* | $ 946.10 |
| (*$2500 paid on account) | | |
| J. H. Rosenbaum | 7,500.00 | 110.63 |
| Jacob A. Markel | 11,500.00* | 275.00 |
| (*$2500 paid on account) | | |
| Independent Stockholders' Committee | | |
| Karl J. Gloekler, Chairman | 180.00 | 121.50 |
| William Barnett, Secretary | 1,500.00 | 500.00 |
| O. B. Hannon | —— | —— |
| Helen Zeuger | —— | —— |
| John N. Houston | —— | |
| Weil, Christy & Weil | | |
| Attorneys for committee: | | |
| Services respecting mortgages | 25,000.00 | 120.98 |
| General services | 10,000.00 | 1,040.41 |
| Howard Duane | | |
| Attorney for committee | 750.00 | 1.89 |
| Unsecured Creditors' Committee | | |
| Richard Fried, Chairman | —— | 156.00 |
| Harry Roihle | —— | —— |
| R. W. Krebs | —— | —— |
| Morris Balter | —— | 45.70 |
| R. H. Coleman, Secretary | 2,500.00 | 418.78 |
| E. J. Balzer | —— | 153.83 |
| Kountz & Fry, | | |
| Attorneys for committee | 8,500.00 | 275.00 |
| Ward & Gray, | | |
| Attorneys for committee | 5,000.00 | 15.70 |
| Mortgage Creditors | | |
| New York Life Insurance Company | —— | 1,827.32 |
| Howard Zacharias and Ivan Culbertson | | |
| Attorneys for New York Life Insurance Company | 25,000.00 | —— |
| Howard Zacharias | —— | 112.25 |
| Ivan Culbertson | —— | 20.38 |
| Marie Estelle McCallam and Jack Goodeno, Mortgagees, and Marshall, | | |
| O'Brien & Nevin, their attorneys | 7,251.91 | 322.07 |
| Robbin B. Wolf, | | |
| Attorney for John N. Piatt | 2,000.00* | —— |
| (*$225 to be decreed to clients; $1775 to be decreed to petitioner) | | |
| Scott & McCune, Inc. | | |
| Mortgage Loan Correspondents | 2,500.00 | —— |
| Donahoe's, Inc., Preferred and Class A Stockholders' Protective Association | | |
| Albert S. Roush, Chairman | 1,200.00 | 139.36 |
| Elinor Cole, Secretary | 3,000.00 | 353.75 |
| Robert J. McCarthy, Treasurer | 500.00 | 354.72 |
| John Joseph O'Connell, | | |
| Attorney for committee | 3,500.00 | —— |
| William L. Jacob, | | |
| Attorney for committee | 1,000.00 | |
| Reich & Reich, | | |
| Attorneys for committee | 1,250.00 | —— |
| Thomas Herlihy, Jr., | | |
| Attorney for committee | 200.00 | —— |
| E. U. Snaman, Expert Witness | 1,000.00 | 134.70 |
| Martin J. O'Connor, | | |
| Member of Committee | —— | 697.00 |

compensation requested amounts to $193,856.33 and the total expenses amount to $17,717.08, making a grand total of $211,573.41. The size of the total is largely due to unavailing and futile efforts to project and carry through the abandoned plan. The only benefit derived from that plan was to afford debtor a breathing spell and the court finds it difficult to estimate in dollars the extent of this benefit. Moreover, there is substantial duplication of services and in certain cases excessive charges for the services rendered.

The abandoned plan was based upon outside bankers' support. The accepted plan was based upon the earning capacity of the debtor to save itself. Thus the final plan was a radical departure from and a repudiation of the main feature of the abandoned plan. Efforts to formulate and to propose the abandoned plan were of slight aid in the formulation and proposal of the final plan which the court confirmed.

## Law

Section 77B permits the court to allow reasonable compensation for services rendered "in connection with the proceeding and the plan". Callaghan v. Reconstruction Finance Corp., 297 U.S. 464, 469, 56 S.Ct. 519, 80 L.Ed. 804. This means services rendered in connection with the plan confirmed by the court. Committees are voluntary organizations of security holders who employ counsel and secretaries at their own risk and without authority of court. They can properly claim compensation only for the benefit they bestow on the debtor. The primary question is what benefit did the services rendered confer upon the debtor. In re Standard Gas & Electric Co., D.C., 26 F.Supp. 636. In re National Department Stores, D.C., 11 F.Supp. 633. The Circuit Court of Appeals of this circuit has summarized the law: "These provisions of the statute obviously confer upon the District Court in making allowances for compensation in corporate reorganization proceedings a wide discretion. As we have recently pointed out this discretion is to be exercised in the light of the extent of the services contributed, the experience and skill required and exercised, the benefit resulting therefrom to the debtor and its securityholders, the size of the debtor and the consequent responsibility undertaken, and the ability of the debtor to pay." Newman v. Ambassador Apartments, 3 Cir., 101 F.2d 307, 308.

## Attorneys for Debtor

February 26, 1937, Stewart Lynch succeeded his former partner as attorney for the debtor. From that day he assumed the principal responsibility for the reorganization. The first matter to which he gave attention was the 370 claims filed with the special master, to many of which debtor had filed exceptions. Through negotiations most of these were disposed of. Only the claim of William Mearkle was litigated. This necessitated a hearing over one day and resulted in the total rejection of the claim. Petitioner prepared for and participated in the hearing on the first amended plan. After consultation with other counsel he filed a brief in support thereof and took part in the argument May 7, 1937. This plan was confirmed June 29, 1937. Ten days thereafter petitioner was served with a notice of appeal from the order of confirmation. He appeared in the Circuit Court of Appeals and successfully resisted the application for appeal. Apprehending the possibility of a certiorari in this matter petitioner obtained a continuance of the case.

| Petitioner | Fees | Expenses |
|---|---|---|
| Miscellaneous | | |
| Stemmler & Company | | |
| Underwriters under first plan | —— | 1,497.77 |
| Breed, Abbott & Morgan, | | |
| Attorneys for Stemmler & Co. | 12,500.00 | 260.65 |
| Enderly Corporation | | |
| Preparing report on debtor | 17,209.17* | 4,103.77 |
| (*$7500 paid on account; balance $13,812.94) and | | |
| D'Oronzo & Katz, | | |
| Making audit of debtor's books, records and accounts. | 19,000.00* | 2,590.77 |
| (*$6250 paid on acct. bal. $15,340.77) | | |
| Ernst & Ernst, Accountants | 3,471.25 | —— |
| William W. Mearkle | 2,000.00 | —— |
| William Prickett, Special Master | 2,594.00 | 121.05 |
| L. W. Monteverde, Expert Witness | 1,250.00 | —— |

October 1, 1937, the court made an order extending the time for the consummation of the plan until January 1, 1938. After the new appraisals were made a meeting was held in New York. The bankers declared it was impossible to go forward with the then plan of reorganization because the new appraisal showed assets valued at less than $4,000,000.

In this chaotic situation petitioner filed an application for leave to pay creditors something on account and extending the time for consummation of the plan. Thereafter and until the first of October, 1938, petitioner was engaged in abortive efforts to secure the financing of·the plan. A further extension was obtained until March 1, 1939. By January, 1939, petitioner and the treasurer of the debtor were convinced that financing by outside interests would be at a prohibitive figure and at a sacrifice of the management of the company. Some six months before, petitioner had arranged to put the company's mortgages on a current basis. In the early part of 1939 it was determined to file a second amended plan of reorganization whereby the creditors of the debtor would themselves provide for the financing of the debtor. Accordingly the second amended plan was filed on the first of April, heard on the 19th of May, and finally approved on the first of August, 1939.

As attorney for the debtor petitioner advised its officers and board of directors on all current matters. He also conducted numerous conferences with the mortgagees and general creditors and their attorneys.

For the above services petitioner will be allowed the sum of Seven Thousand Five Hundred Dollars ($7,500) in addition to the Two Thousand Five Hundred Dollars ($2,500) heretofore paid on account, and his expenses of Nine Hundred Forty-Six Dollars and ten cents ($946.10).

■ Jacob A. Markel, a resident attorney of Pittsburgh, was authorized by the court to serve as an attorney of the debtor. One of the chief embarrassments of the debtor were unpaid taxes due the Commonwealth of Pennsylvania for the years 1929 to 1935 inclusive. These taxes were of three kinds,—capital stock tax, foreign bonus tax, and corporate loan tax. Adjusting these tax matters was essential to any reorganization of the debtor. Debtor's liability therefore amounted to $68,200. Petitioner secured the settlement of this debt for $12,200. An interim allowance to petitioner for tax services of $2,500 has been paid. On an unprofitable lease petitioner effected a saving of $14,000. He secured cancellation of a personal service contract where the claimant asked for $7,550. Petitioner compromised this claim by the payment of approximately $450.

Petitioner should receive in addition to the interim allowance already paid the sum of Six Thousand Five Hundred Dollars ($6,500) for all services, together with his expenses of Two Hundred Seventy-Five Dollars ($275).

■ Joseph H. Rosenbaum was a son of J. N. Rosenbaum, executive vice president of the debtor, who procured his employment as an attorney of the debtor. Immediately after the flood petitioner journeyed to Pittsburgh with John Biggs, Jr., who obtained the necessary information from the president of the debtor upon which the petition for reorganization was based. After approval of the petition his employment as attorney was authorized. Petitioner's first service related to the application of the Roush committee for a transfer of the proceedings to Pittsburgh. He conferred with Mr. Biggs in the preparation of affidavits in opposition to the transfer but took no part in opposing the Roush appeal. Petitioner took small part in negotiating between the debtor and Stemmler & Company, an underwriting house in New York. In February, 1937, Mr. Biggs retired from the case and was succeeded by his partner Lynch. Thereafter petitioner conferred with Lynch.

Petitioner admits that he contributed nothing to the second amended plan of reorganization that was confirmed by the court. Although present in court on several occasions petitioner took no personal part in the proceedings. His services consisted principally in participating in conferences where the debtor was represented by other and competent counsel. Whatever services he rendered in connection with an application to the Reconstruction Finance Corporation for a loan, such services were rendered before these proceedings were instituted and were paid for by the debtor. He testified he did not "prepare any of the papers which were filed, such as petitions or orders or anything like that".

He has received Two Thousand Five Hundred Dollars ($2,500) and should receive in addition thereto as compensation for all services the sum of One Thousand

684

Dollars ($1,000), together with his expenses of One Hundred Ten Dollars and sixty-three cents ($110.63).

Independent Stockholders Committee

■ This committee included five members. Gloekler served as chairman for three years. He testified the committee had a dozen meetings and mailed to stockholders six letters. He asks for $180 as compensation and states that he arrived at the amount "purely by guess". He will be allowed One Hundred Dollars ($100) as compensation and One Hundred Twenty One Dollars and fifty cents ($121.50) for expenses.

■ William Barnett was secretary of the committee. He estimates that he devoted fully thirty days to services on the committee besides having interviews with stockholders. Being widely known by the stockholders many conferred with him upon the affairs of the company. Petitioner submits no itemized statement of expenses. He will be allowed Five Hundred Dollars ($500) to cover both compensation and expenses.

■ A. Leo Weil, Jr., of the firm of Weil, Christy and Weil, claims compensation in two separate capacities: (1) As attorney of debtor; and (2) as attorney of the independent stockholders committee. Before the reorganization proceedings were instituted, his firm had been retained by the debtor to negotiate with certain mortgage creditors for relief. After March, 1936 petitioner was requested by debtor to continue these negotiations. In June, 1936, debtor was authorized to employ petitioner as special counsel in these matters.

Prudential Insurance Company held a mortgage of $116,000 with unpaid interest of $5,000. Petitioner negotiated a reduction of the mortgage from $100,000 to $80,000 upon the payment of $10,000 and a reduction of the rate of interest from 5% to 4%.

Petitioner rendered service respecting three other mortgages totaling with unpaid interest over $400,000. These were a mortgage of $190,000 held by the Dollar Savings Bank of Pittsburgh and two other mortgages of $90,000 and of $79,500 held by Fidelity Trust Company of Pittsburgh. In the plan of reorganization as originally filed there was a provision pertaining to "contingent liabilities". It provided that upon reorganization the new company would assume these mortgage obligations.

The term "contingent liabilities" was a mistake. Had the provision been retained it might have proved an embarrassment. Petitioner saw this defect in the plan and called it to the attention of the parties concerned at a meeting in New York City. As a result of the efforts of petitioner an agreement was entered into between the debtor and the mortgagees whereby the mortgages were to be extended for a period of six years. During that term it was provided that the deficiencies consisting of unpaid interest, taxes, etc., should be liquidated and at the expiration of the term the mortgagees agreed to look only to the security pledged under the mortgage and not to the mortgagors.

Although petitioner is willing to take sole credit for this salutary agreement it appears from the proof that others detected the flaw in the original plan of reorganization before it was called to debtor's attention by petitioner. However, the credit of suggesting a remedy appears to be largely his. Petitioner testified that he carried on extensive negotiations with the New York Life Insurance Company and its representatives for a renewal of its mortgage upon more favorable terms. Under the first plan this mortgage was to be paid in full with interest. Petitioner admits that neither he nor his firm shared in the negotiations which led to the ultimate extension agreement of the New York Life Insurance Company. It is apparent that the New York Life Insurance Company mortgage, the Piatt mortgage and the Murdock mortgage were to be paid in full under the first plan of reorganization. It is obvious neither petitioner nor his firm could have contributed anything to improve that situation. It is equally clear that after the first plan was abandoned Lynch negotiated with the attorneys for the New York Life Insurance Company the extension agreement. Consequently the substantial service rendered by petitioner was with respect to the Piatt and Murdock mortgages.

Petitioner also asks for an allowance for services as attorney of the independent stockholders committee. He joined the attorney for the debtor in opposing the effort of the Roush Committee to remove the proceedings to the Western District of Pennsylvania and to have trustees appointed for the debtor. He enlisted the cooperation of the committee of unsecured creditors, John N. Piatt and the two Pittsburgh trust companies. He assisted the committee in ob-

taining acceptances of the first plan of reorganization which were used in connection with the final plan. He participated in the court proceedings urging confirmation of the plan. He attended three meetings in New York and five hearings in Wilmington. He conducted considerable correspondence.

Petitioner's services in connection with the mortgages and as attorney for the independent stockholders committee covered the same period of time and are so interrelated that they can not be properly separated. For all services the court will allow petitioner as full compensation the sum of Seven Thousand Five Hundred Dollars ($7,500) together with his expenses of One Thousand One Hundred Sixty-One Dollars and thirty-nine cents ($1,161.39).

■ Howard Duane was first retained by the independent stockholders committee in April, 1936, immediately before the hearing of the petition for a transfer of these proceedings to Pittsburgh. He attended the hearings with the counsel for the committee. His next service was resisting the petition of the New York Life Insurance Company for payment for use and occupancy. He filed an answer prepared by Weil. In April, 1937 his committee intervened. He opposed an appeal taken by the Roush Committee from the order confirming the first plan of reorganization. He appeared at various times respecting the second plan. In all he made 8 or 10 appearances and during the last eight months was sole counsel for the committee. Petitioner will be allowed Five Hundred Dollars ($500) as compensation, and his expenses of One Dollar and eighty-nine cents ($1.89).

### Unsecured Creditors Committee

■ This committee consisted of representatives of Armour & Company, Wilson & Company, Fried & Reineman Packing Company and Baltimore Paper Company. It represented between $40,000 and $50,000 of the total unsecured indebtedness of $190,000. It obtained proxies representing $125,000. The committee selected R. H. Coleman as secretary. This committee had 20 meetings. It recommended a cut in salaries. It sent out 20 circulars and answered 276 inquiries. Generally it dispelled false rumors and helped to persuade creditors that debtor was safe to deal with. Neither the chairman nor any member of the committee ask compensation. The committee, of course, representing large supply houses were interested in a continuation of the business. However, it contributed to the reorganization proceedings. Its secretary will be allowed One Thousand Five Hundred Dollars ($1,500) and expenses of Four Hundred Eighteen Dollars and seventy-eight cents ($418.78). Also the expenses of Richard Fried, chairman in the sum of One Hundred Fifty-Six Dollars ($156); Morris Balter in the sum of Forty-Five Dollars and seventy cents ($45.70) and E. J. Balzer in the sum of One Hundred Fifty-Three Dollars and eighty-three cents ($153.83) will be allowed.

■ A. E. Kountz, of Kountz and Fry, of Pittsburgh was retained by the committee two days after its organization. He retained Ward & Gray of Wilmington as associate counsel. The first meeting was a conference with officers of the company to oppose transfer of the proceedings to Pittsburgh. Petitioner prepared an answer to the application seeking transfer. In April, 1936, with Hughes he opposed the transfer. The committee arranged with the debtor to examine its books and to receive monthly operating statements. In the summer of 1936 petitioner with the secretary of the committee negotiated through the attorney for the debtor a reduction of salaries. Petitioner had numerous conferences with the debtor and members of the committee respecting the first plan of reorganization. The requested acceptances having been obtained, petitioner attended a hearing on the final plan on May 19, 1939, and participated therein. He examined the secretary of the committee who supported the amended plan. Petitioner prepared and filed an answer to the petition of New York Life Insurance Company for payment for use and occupancy. Petitioner went to Wilmington and participated in the hearing in opposition. Petitioner looked after the filing of proofs of claim of the various creditors whose proxies were held by the committee and had considerable correspondence in ironing out differences in amounts. An examination of the 22 page memorandum attached to the petition for an allowance shows that the major part of the work done by petitioner consisted of writing letters, making telephone calls and attending conferences. The principal serv-

ice of petitioner was holding together the unsecured creditor group. Petitioner will be allowed Three Thousand Dollars ($3,000) as compensation, and his expenses of Two Hundred Seventy-Five Dollars ($275).

The petition of Ward and Gray was filed on behalf of the estate of James H. Hughes, Jr., who died in July, 1938. Hughes became associated with Kountz in April, 1936, and cooperated with him. From the record it appears that Hughes was more than a formal local counsel. He participated in the court hearings although he died before the final plan of reorganization had been conceived or proposed. Ward & Gray, representing the estate of Hughes, will be allowed the sum of One Thousand Five Hundred Dollars ($1,500), and expenses of Fifteen Dollars and seventy cents ($15.70).

## Mortgage Creditors

Howard Zacharias is a Pittsburgh attorney and there represented the New York Life Insurance Company for 12 years. In December, 1935, petitioner received from the Insurance Company debtor's bond and mortgage for $1,200,000 with instructions to collect the arrears in interest of $29,700 due in September, 1935, and the installment of principal of $16,000 then due. Petitioner consulted the attorneys for the debtor who declined to pay arrearages until the interest rate was reduced. The company replied by instructing petitioner to foreclose. The next installment of interest was due March 15 and the flood occurred March 17, 1936.

The reorganization petition was filed March 23, 1936. Thereupon Zacharias associated as co-counsel Hugh M. Morris and Ivan Culbertson of Wilmington. With Culbertson, Zacharias attended the hearing on the petition to transfer to Pittsburgh. They opposed the petition. The question of interest and the next installment of principal due March 15 was taken up. Culbertson saw Mr. Biggs who offered to pay the back interest if the Insurance Company would reduce the rate of interest. Petitioner was then instructed by the Insurance Company to file a petition against the debtor for use and occupancy. Such a petition was filed in July and heard in September, 1936. The hearing took two days. Petitioner prepared a plat showing Pittsburgh real estate and furnished three or four expert witnesses on values. Both Culbertson and Zacharias prepared briefs which were submitted. The court denied this petition.

Under the first plan the Insurance Company was to be paid in full. This, of course, was acceptable and nothing of importance was done until April, 1937. It then became apparent that outside banking assistance was impossible and that the debtor must reorganize through its own exertions with the assistance and cooperation of the mortgage creditors and primarily the New York Life Insurance Company. In the summer of 1938 an agreement was reached with the debtor to pay $35,000 delinquent interest and thereafter a monthly payment of $5,000 to the Insurance Company. Thereupon the Insurance Company reduced the rate of interest from $5\frac{1}{2}\%$ to $4\frac{1}{2}\%$ and extended the term of the mortgage for a further period of ten years.

Petitioner made 10 trips to Wilmington and two to New York. He had extended conferences with Lynch in Wilmington and with O'Brien in Pittsburgh. In all important steps taken by Zacharias, Culbertson participated. He was the active representative of the New York Life Insurance Company in Wilmington. As hereinbefore stated the mortgage of over one million dollars and the equitable terms for its liquidation were the basis for this reorganization. Without the services and cooperation of petitioners no reorganization was possible.

Zacharias and Culbertson will be allowed as compensation for their joint services the sum of Twenty-Two Thousand Five Hundred Dollars ($22,500). Zacharias will also be allowed One Hundred Twelve Dollars and twenty-five cents ($112.25) for his expenses and Culbertson Twenty Dollars and thirty-eight cents ($20.38) for his expenses. Of the expenses incurred by the Insurance Company in connection with the hearing on its petition for use and occupancy, which was denied, the amounts paid expert witnesses and the expenses of counsel will be disallowed. The sum of One Hundred Ninety-Five Dollars and forty-four cents ($195.44) will be allowed.

Scott and McCune, Inc., were mortgage loan correspondents for the New York Life Insurance Company in Western

Pennsylvania. It sells mortgages and services them. The paper work incident to the extension of mortgages goes through its hands. The extension of the New York Life Insurance Company mortgage was negotiated by Zacharias and Culbertson representing the Insurance Company and Lynch representing the officers of the debtor. For services rendered this company will be allowed the sum of One Thousand Dollars ($1,000).

■ Another mortgage with which the debtor was burdened is the Murdock mortgage. Marie Estelle McCallam and Jack M. Goodeno, owners of the mortgage, petition for reimbursement of the amounts paid by them to Marshall, O'Brien and Nevin, their attorneys. It was originally for $190,000. In March, 1936, it was reduced to $150,000, bearing 6% interest. The property covered by the mortgage adjoins the Fifth Avenue store of the debtor and was rented at $850 a month. Mortgagees under Pennsylvania law were entitled upon default to the rents after deducting taxes. In September, 1936, petitioners filed a petition asking that the amounts received by the debtor as rent be decreed to them as a preferred claim. Their status was like that of the New York Life Insurance Company and they followed in its wake. The debtor required an extension of this mortgage and services of the attorneys representing the mortgagees should be compensated. Petitioners will be allowed the sum of Six Thousand Five Hundred Dollars ($6,500) as compensation for services, and expenses of Three Hundred Twenty-Two Dollars and seven cents ($322.07).

■ Robbin B. Wolf, a Pittsburgh lawyer, represents the holder of the Piatt mortgage. In December, 1935, the mortgage had a balance due of $100,000 with three or four thousand dollars of unpaid interest. Petitioner conferred with debtor's representatives and finally agreed to reduce the mortgage to $80,000 upon receipt of $10,000. Before the reorganization proceedings were brought, $6,500 had been paid and afterwards a balance of $3,500 was paid. After the original plan failed negotiations were resumed for the extension of this mortgage. It was agreed that when $75,000 was paid the mortgage of $80,000 would be surrendered. In addition the rate of interest was reduced from 6% to 4%. Before the reorganization proceedings, petitioner was paid $1,-000 for collecting the $10,000. For his services petitioner will be allowed One Thousand Five Hundred Dollars ($1,500) which will enable him to make restitution of Two Hundred Twenty Five Dollars ($225) to his client.

### Miscellaneous

April 1, 1936, debtor was authorized and directed to retain Enderley Corporation to determine the extent of the loss by reason of the flood and to make an appraisal of all the real estate, personal property and assets of the debtor. Also by the same order the debtor was authorized and directed to retain D'Oronzo & Katz, certified public accountants, to make an audit of the company's books, records, accounts and affairs subject to the supervision of Enderley Corporation.

For those services Enderley Corporation have petitioned for an allowance of $17,209.17 and $4,103.77 expenses. On October 21, 1936, $7,500 was directed to be paid to Enderley Corporation on account of these charges. This amount was paid.

For their services D'Oronzo & Katz have petitioned for compensation in the amount of $19,000 and $2,590.77 expenses. October 21, 1936, debtor was authorized to pay $6,250 on account of these charges. This amount was also paid.

October 1, 1937, debtor was authorized and directed to engage the services of American Appraisal Company to make an appraisal of the properties of the debtor which were to be subject to the lien of the mortgage provided for in the first plan of reorganization, as requested by Stemmler & Company. The order limited their compensation to $3,500. This appraisal was made and cost debtor less than $3,500. October 1, 1937, debtor was authorized and directed to engage the services of Ernst & Ernst, certified public accountants, to make an examination and report on the books of account and records of debtor; the compensation therefor not to exceed $7,500. In December, 1937, debtor paid to Ernst & Ernst on account $2,000 and in December, 1938, paid them an additional sum of $5,000. Subsequently Ernst & Ernst applied for a further allowance of $3,471.25.

■ From the foregoing it appears that the debtor is charged for appraisals and audits a total amount of $56,874.96. It is difficult to understand the necessity for the second appraisal and audit. In the

year and a half following the first appraisal and audit the company's properties had been fully restored and the business outlook had greatly improved.

April 1, 1936, a vice president of Enderley with a stenographer and a young man proceeded to Pittsburgh and set up a field office. There were great piles of debris in the back part of the main store. The refrigerating system and machinery in the basement were not functioning. The warehouses were under 18 feet of water. Cars loaded with fresh merchandise were flooded.

Nine men participated in the appraisal. They started work April 1 and concluded August 14, 1936, when the appraisal was filed. Six weeks were spent in Pittsburgh. The appraisers obtained from the company that made the fixtures for the refrigeration system a list of all the equipment and a good idea of its value. The business was appraised as a going concern. The warehouse was inspected by an insurance appraiser whose certificate was accepted. In appraising the electrical machinery and wiring Enderley secured the assistance of a registered consulting engineer of wide experience and good reputation. In appraising the buildings and rentals they were assisted by the president of the real estate board of Pittsburgh. August 14, 1936, Enderley Corporation submitted an appraisal of the debtor's assets and a report on the extent of the damage due to the flood. In their report they stated: "The total assets of the corporation have, in our opinion, a sound value of $2,974,215.13."

Enderley's petition for allowances and expenses has annexed thereto an itemized statement of the time spent and persons employed. A review of the petition and record convinces the court that the amount sought is excessive. From the statement it appears that each person employed charged the round sum of $10 per hour and that the compensation sought is based thereon. For example, one person charges $140 for one day's service, another $170 for one day's service. The court allows to Enderley Corporation as the balance of compensation for services Five Thousand Dollars ($5,000), and expenses of Four Thousand One Hundred Three Dollars and seventy-seven cents ($4,103.77).

D'Oronzo & Katz rendered their auditing services under conditions similar to those surrounding Enderley Corporation and at approximately the same time.

The same considerations affecting Enderley Corporation apply to D'Oronzo & Katz. These petitioners will be allowed for the balance of their compensation Four Thousand Dollars ($4,000) and Two Thousand Five Hundred Ninety Dollars and seventy-seven cents ($2,590.77) for expenses.

Ernst & Ernst audited the books and accounts for the years 1935, 1936 and 1937. An examination of their report shows that their charges are normal. The balance amounting to Three Thousand Four Hundred Seventy-One Dollars and twenty-five cents ($3,471.25) will be allowed.

Stemmler & Company petition for reimbursement of out of pocket expenses in the sum of $1,497.77. This amount was spent in traveling to meetings of the company and in interviewing other investment bankers. Petitioner wisely refrains from seeking compensation for services. Its service was mainly, if not entirely, a psychological one. Petitioner's representative testified that when debtor's creditors learned that Stemmler & Company, a well recognized conservative banking house, had signed an underwriting agreement, almost overnight they looked at their security with a less jaundiced eye. Petitioner gave debtor a breath of hope. Petitioner had nothing to do with the second or final plan of reorganization. It made one of the conditions of the bond issue that debtor's property should be appraised by a company satisfactory to it in an amount of at least $4,000,000. Before appraisal they unwisely devoted time and employed counsel. Petitioner's expenses in the sum of One Thousand Four Hundred Ninety-Seven Dollars and seventy-seven cents ($1,497.77) will be allowed.

In November, 1936, Charles S. Tuttle of Breed, Abbott & Morgan was retained by Stemmler & Company to advise them respecting refinancing the debtor. He had numerous conferences with the debtor, its counsel and Stemmler & Company. Thereafter the first plan of reorganization and an underwriting agreement were prepared whereby Stemmler & Company agreed to purchase $2,500,000 first mortgage bonds and 260,000 shares of common stock. The Roush Committee filed objections to the plan. There was a hearing thereon in which petitioner took part. June 29, 1937, the court found the plan fair and feasible. The underwriting agreement provided that before the bankers should purchase the bonds and stock there should be furnished

to them a current appraisal, by appraisers satisfactory to the bankers, showing that the properties covered by the new mortgage had a value of not less than $4,000,000. The underwriting agreement provided that in the event the agreement was cancelled because of failure to comply with its terms the company would "reimburse the Bankers for all their out-of-pocket expenses (including fees and disbursements of counsel for the Bankers) reasonably incurred by the Bankers in connection with or arising out of this agreement". In December, 1937, American Appraisal Company made an appraisal of the property showing a value of $2,558,047.81. Petitioner states that this figure was a "bombshell". However, it is difficult to reconcile surprise with the letter of Stemmler & Company to the debtor of November 19, 1936, in which the bankers declare they have had access to the Enderley appraisal of August 4, 1936, and the audit of D'Oronzo & Katz. Enderley's figure was $2,974,215.13. The Enderley appraisal was of all the assets of the debtor and the business as a going concern. The American Appraisal Company's appraisal was restricted to the property covered by the new mortgage. It was the imperative duty of the bankers to have the appraisal of the mortgaged property made before incurring substantial expenses. The entire loan hinged on an appraisal showing assets of át least $4,000,000. Stemmler & Company recognized that their services were fruitless. The same is true in large part of the services of their attorney.

After the second appraisal there were some ineffectual efforts made to carry out the first plan. Nothing came of them. All recognized that a reorganization based upon bankers' loans would have to be abandoned. December 31, 1937, debtor requested a continuance of the reorganization proceedings in order that a modified plan could be brought forward. It was proposed that the bankers underwrite an issue of debentures in the sum of $600,000. This idea was abandoned.

Petitioner relies upon the clause in the underwriting agreement relating to the cancellation thereof and providing that "the Company will reimburse the Bankers for all of their out-of-pocket expenses (including fees and disbursements of counsel for the Bankers) reasonably incurred by the Bankers in connection with or arising out of this agreement." Debtor, being in reorganization, was subject to the law covering its status. The law provides that

services rendered in connection with the proceeding and the plan may be compensated. Services of the bankers were enlisted to provide a substantial loan. This service was not rendered. Petitioner was Banker's attorney whose services were devoted to the bankers. If both services failed they are entitled to the same consideration from the court. Petitioner, however, by conferring with debtor and creditors of the debtor, performed some service beneficial to the estate outside the services rendered to the bankers. For all services of benefit to the estate an allowance to petitioner of Two Thousand Five Hundred Dollars ($2,500) will be made, and expenses of Two Hundred Sixty Dollars and sixty-five cents ($260.65).

December 10, 1935 Donahoe's Incorporated Preferred and Class A Stockholders Protective Association was formed. It consisted of 24 members who were largely holders of small blocks of stock. To these members corporate reorganization was an unfamiliar business. They were primarily if not wholly concerned with what was coming to them. Albert S. Roush served as chairman from the formation of the committee until May 23, 1939. Eleanor Cole, a married woman with a husband and two small children served as secretary. Robert J. McCarthy served as treasurer of the association since its organization. In addition to these three officers of the association, allowances are sought by four lawyers, an expert witness and one of the individual members of the committee. The compensation sought by these persons totals $11,650 and expenses of $2,679.53.

Roush, the chairman, attended 22 general meetings and 15 special meetings. He also conferred with the debtor on six occasions in an effort to work out a better plan of reorganization. An agreement was made with the debtor whereby 12,612 additional shares of common stock were given to the preferred stockholders. April 6, 1936, Roush, individually and as chairman of the association filed a petition to transfer these proceedings to Pittsburgh. He attended the hearing and urged the transfer. In March, 1937, he attended a conference of bankers and debtor's representatives regarding the amendment of the plan of reorganization. In April, 1937, he attended a hearing in this court to oppose the confirmation of the first plan. From the order confirming the first plan he took an appeal which was dismissed. He did

not oppose the final plan and resigned from the association when Reich & Reich were employed to oppose the final plan.

Mrs. Cole, the secretary, sent out notices and attended 24 general meetings and 15 special meetings. She addressed five sets of circulars and prepared and addressed 1,000 cards. The association held its meetings in the Moose Temple in Pittsburgh when large numbers of stockholders attended. She had a telephone installed in her home. She interviewed stockholders and attended the hearings in Wilmington. McCarthy, the treasurer, attended 24 general meetings and 10 special meetings of the association. He paid the bills and took care of the finances.

The services of this association were principally obstructive. Although the association was guided by several lawyers there is no basis in the record for making an allowance of compensation to anyone. Since the hearing on allowances, Jacob withdrew his application. Reich & Reich did not come into the picture until May, 1939, just before the hearing on the final plan which they vigorously opposed. They have filed notice of appeal from the order of confirmation.

In law there is no basis for an allowance of compensation to any of the members of this association petitioning for the same nor to their attorneys. However, expenses will be allowed to the following petitioners in the following amounts: Albert S. Roush One Hundred Thirty-Nine Dollars and thirty-six cents ($139.36); Eleanor Cole Three Hundred Fifty-Three Dollars and seventy-five cents ($353.75); Robert J. McCarthy One Thousand Three Hundred Fifty-Four Dollars and seventy-two cents ($1,354.72); E. W. Snaman One Hundred Thirty-Four Dollars and seventy cents ($134.70); Martin J. O'Conner Six Hundred Ninety-Seven Dollars ($697).

 Louis W. Montaverde came to Wilmington from Pittsburgh at the request of the debtor to testify as an expert real estate appraiser in connection with the hearing on the abandoned plan of reorganization. December 29, 1937, he was paid $400 on account. The court allows him the further sum of One Hundred Dollars ($100) in full compensation for services rendered.

William Prickett, to whom the proceedings were referred as special master on July 8, 1936, will be allowed Two Thousand Five Hundred Ninety-Four Dollars ($2,594) as compensation, and One Hundred Twenty-One Dollars and five cents ($121.05) as expenses.

William W. Mearkle filed his claim for $30,000 stating that the debtor had "authorized and instructed him * * * to secure a two million dollar mortgage loan". After full hearing the special master disallowed the claim. The special master refused to pass upon the legal effect of the following facts: It appears that after the filing of the reorganization petition, Mearkle wrote a letter to the treasurer of the debtor offering to compromise his claim for $2,000. As a postscript to this letter Donahoe wrote "Application for approval of an order authorizing the payment of the sum of $2,000.00 will be immediately made". No application for approval of this compromise was ever submitted to the court and there has never been any attempt by petitioner to compel the debtor to make such an application. It is perfectly apparent that the debtor being in reorganization had no power or authority to enter into a compromise such as this. If the language be construed to be an undertaking to pay $2,000 it is void. Had an application for approval been made to this court it would have been denied. Accordingly this application is denied.

An order may be submitted.